UNITED STATES of America

v.

Joseph T. JOHNSON, Appellant.

No. 74–1198.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 27, 1975.

Decided March 24, 1976.

Frederick H. Robinson, Jr., Washington, D.C., with whom John S. Nolan, Washington, D.C. (both appointed by this Court), were on the brief for appellant.

Edward C. McGuire, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, James F. McMullin, and Eugene M. Propper, Asst. U. S. Attys., Washington, D.C., were on the brief for appellee.

Before BAZELON, Chief Judge, GEORGE EDWARDS,* Circuit Judge for the Sixth Circuit, and TAMM, Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS.

Opinion filed by Chief Judge BAZELON concurring in result.

EDWARDS, Circuit Judge:

This is an appeal from denial of a petition to vacate sentence under 28 U.S.C. § 2255 (1970). The District Judge who conducted a brief and nonevidentiary hearing on this motion denied it on the basis of the record of the jury trial at which he had presided. At that trial appellant had been found guilty of second degree murder in the 1967 stabbing death of his wife and had been sentenced to from seven years to life imprisonment. This conviction had been af-

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

firmed without opinion by this court (D. C. Cir. # 24,225, decided April 22, 1971).

On appeal from denial of the § 2255 motion appellant contends that statements taken from him at the police station without *Miranda* warnings should have been excluded on constitutional grounds, even though his counsel at the trial did not object to them. Appellant also contends that the record does not conclusively show a deliberate bypass of orderly federal procedure as apparently found by the District Judge who denied the motion.

Neither of these issues had been presented at trial or on direct appeal. To decide them we need a somewhat detailed statement of facts.

Appellant's version of the events on the night of the murder was given only to the police and came into the trial record only by police testimony since he did not testify before the jury. It was that he and his wife separated during the evening in question, he going home earlier, and then after a phone call from her around midnight, that he set out to meet her at the bus stop and found her there stabbed and dying. He and a passer-by took her to the hospital where police reported and took him and the good samaritan to the station house.

Appellant and the passer-by were both questioned without *Miranda* warnings. Appellant gave an exculpatory statement indicating that his wife had been fatally wounded when he first met her at the bus stop. Appellant, who had never been told he was under arrest, was released and driven home by the police in the early morning hours. He was questioned again the next day at his apartment to which appellant admitted the police. The police found the deceased wife's umbrella at the house. This was apparently inconsistent with appellant's version of the facts since she had had the umbrella with her earlier in the evening. At this point appellant was arrested.

At the trial two witnesses who lived in the same apartment building as appellant testified to hearing noises on the night in question which could have come from appellant's apartment. One witness testified to a terrifying scream and then the noise of two persons running, and later the noise of one person running back. The deceased wife's brother testified to finding her injured one night some months before the murder after an altercation during which, appellant told him, he had hit her over the head with a chair. This episode had led to some months of separation which ended with reconciliation just a few weeks before the murder.

There was no eye witness of the murder who testified. The prosecution succeeded over vigorous objection in introducing the umbrella referred to above and police testimony about where it was found and about the absence of any knives in appellant's apartment. This latter evidence was arguably relevant both because appellant's wife died from a stab wound in her neck and because her sister testified that she had given the Johnsons a set of steak knives. A motion to suppress physical evidence seized by the police occasioned a hearing outside the presence of the jury. This was the only occasion on which appellant testified. After listening to appellant's version and that of the police about their entrance to appellant's apartment, the District Judge found that the police had entered with appellant's voluntary consent and admitted the evidence.

On direct appeal, as noted earlier, the validity of this last decision was the primary issue presented and this court affirmed without opinion. No issue was presented on direct appeal concerning police testimony about appellant's statements at the station house on the night of the murder. But in the motion to vacate sentence and on the present appeal, these statements and their admission at trial are the sole focus.

Attached to this opinion as Appendices A, B and C are A) the transcript of the hearing on the § 2255 motion; B) the transcript of the trial court's sua sponte inquiry into the admissibility of appellant's statement to the police; and C) the transcript of the statements as related by the police.

Our reading of Appendix C indicates to us that appellant's statements to the police as quoted by them were clearly intended to be purely exculpatory.

Our reading of Appendix B indicates that the District Judge entirely sua sponte raised and insisted on exploring the voluntariness of these statements and the question of whether they were barred by reason of appellant being "in custody" at the time. They were made without his having been given *Miranda* warnings. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). At the hearing on this issue initiated by the District Judge, appellant's attorney made no effort at all to contest the admissibility of appellant's written statement or to contest police evidence tending to establish that the statements were voluntary on appellant's part and were given when he was not in custody. Appellant's counsel indicated approval of the District Judge's decision that the statements were not made in custody and were admissible. Appellant was present during all these proceedings and offered no objection.

Our reading of Appendix A (and this record) convinces us that the District Judge had a vivid memory of this case [1] and correctly concluded from its record that appellant had "deliberately bypassed the orderly procedure" of the federal courts within the meaning of *Fay v. Noia,* 372 U.S. 391, 438, 83 S.Ct. 822, 848, 9 L.Ed.2d 837, 868 (1963), and *Henry v. Mississippi,* 379 U.S. 443, 451–52, 85 S.Ct. 564, 569, 13 L.Ed.2d 408, 415 (1965).

In *Kaufman v. United States* the Supreme Court said:

Where a trial or appellate court has determined the federal prisoner's claim, discretion may in a proper case be exercised against the grant of a § 2255 hearing. Section 2255 provides for hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . ."

In *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), we announced standards governing the determination whether a hearing should be ordered in the case of a successive motion under § 2255. Similarly, where the trial or appellate court has had a "say" on a federal prisoner's claim, it may be open to the § 2255 court to determine that on the basis of the motion, files, and records, "the prisoner is entitled to no relief." See *Thornton v. United States,* 125 U.S. App.D.C. 114, 125, 368 F.2d 822, 833 (1966) (dissenting opinion of Wright, J.).

Furthermore, the § 2255 court may in a proper case deny relief to a federal prisoner who has deliberately bypassed the orderly federal procedures provided at or before trial and by way of appeal—*e.g.,* motion to suppress under Fed.Rule Crim. Proc. 41(e) or appeal under Fed.Rule App. Proc. 4(b). *Fay v. Noia, supra,* [372 U.S.] n.3, at 438 [83 S.Ct. 822 at 848]. *Henry v. Mississippi, supra,* [379 U.S.] n.3, at 451–452 [85 S.Ct. 564 at 569–570, 13 L.Ed.2d at 415].

*Kaufman v. United States,* 394 U.S. 217, 227 n.8, 89 S.Ct. 1068, 1074, 22 L.Ed.2d 227, 238 (1969).

We believe that the District Court in this case offered appellant full opportunity to object to admission of the now disputed statements. We also believe that the District Judge was right when at the § 2255 hearing he said that appellant's failure to object or present evidence was "a calculated piece of business." Even appellant's counsel at the § 2255 hearing recognized that "for strategic reasons Mr. Williams [appellant's trial counsel] wanted that statement in." Although he did not use the words, we believe his § 2255 disposition represented his finding of "a deliberate bypassing attributable to the defendant." *United States v. Haywood,* 150 U.S.App.D.C. 247, 464 F.2d 756 (1972).

We recognize that appellant relies strongly upon the *Haywood* case just cited as

---

1. At the hearing on sentence in this case the District Judge was required to administer to appellant another sentence for manslaughter of a person whom he knifed to death while out on bond awaiting sentence.

establishing his right to a § 2255 hearing. In *Haywood* the facts upon which remand for hearing was predicated were these:

> Appellant, in his *pro se* Section 2255 motion, alleges that he specifically requested trial counsel to file a motion to suppress the evidence, that just prior to trial a further request was made that since counsel had not filed the motion to suppress, he secure for the court's approval a copy of the search warrant. Appellant further alleged that at trial, counsel failed to determine for the record the circumstances under which the evidence, which was introduced at trial, was obtained by the search, and that he did not cross-examine any witness who testified regarding the evidence, or object to the statement of the prosecutor that the search was authorized by a legal warrant. These unresolved allegations are quite material to the question whether there was a deliberate bypassing, which could be attributed to appellant, of the orderly procedures. *United States v. Haywood, supra* at 761–62.

Neither in appellant's pro se motions, nor in his appointed counsel's motion, nor in appointed counsel's proffer of evidence to the District Court at the § 2255 hearing were any such disavowals of appellant's counsel's trial strategy set forth. We recognize that the Supreme Court has said that a government claim of a deliberate bypass forfeit of constitutional rights usually requires an evidentiary hearing.

> An evidentiary hearing will ordinarily be required before the District Court can determine whether petitioner made a deliberate strategic waiver of his claim in state court. In this case, a hearing is necessary to determine (1) the reason for counsel's failure to file a brief or to take further action in the state courts, and (2) the extent of petitioner's knowledge and participation in that decision. If the District Court cannot find persuasive evidence of a knowing and intelligent waiver on the part of petitioner himself, then the Court should proceed to consider petitioner's constitutional claims. *Humphrey v. Cady,* 405 U.S. 504, 517, 92 S.Ct. 1048, 1056, 31 L.Ed.2d 394, 407 (1972).

Here, however, the § 2255 hearing judge had presided at the original trial. He had, sua sponte, raised the admissibility of appellant's statements and carefully explored the facts under which they were given. The statements were obviously intended to be purely exculpatory and were in fact the only defense which appellant presented before the jury. Appellant's counsel was given repeated opportunity to object to their admission and (in appellant's presence, of course) repeatedly waived objection to their admission.

Under the total facts of this case, we find no grounds for reversal of the District Judge's denial of this § 2255 motion.

The judgment of the District Court is affirmed.

## APPENDIX A

[Mr. Weiss (Appellant Johnson's counsel)].

I proffer, if the Court would allow Mr. Johnson to testify briefly, that his testimony would be that he felt that at the time he was taken from the hospital to the stationhouse that he was under arrest, and that he wasn't asked, "Would you like to come along?" He was told to come along. And that there was another witness, a man named Jones, whom I am unable to locate—I am trying to find him—who was invited to come along, and that Mr. Johnson was ordered to come along, and that because of this, we would contend that the investigation had already focused upon Mr. Johnson, that he was a suspect.

THE COURT: Didn't I go into that at the time of trial?

MR. WEISS: I have that portion of the transcript. There was a hearing on it. Mr. Johnson did not testify at that hearing.

THE COURT: I thought that I was pretty sensitive about any statements that might come in. I remember asking some questions about that.

MR. PROPPER: May it please the Court. Attached is the Government's opposition is the testimony in which this hearing took

place. I do have an additional copy. Your Honor brought it up sua sponte, and I do have all of the questions in there.

MR. WEISS: However, Mr. Johnson did not testify at that hearing. I believe for strategic reasons Mr. Williams wanted that statement in. It was a method of getting Mr. Johnson's version of the incident before the jury without having him testify and be subjected to cross-examination. So, for that reason I think it was part of Mr. Williams' theory of the case that he could get his version of the story in and he wouldn't have to testify.

THE COURT: I can understand that. If I were representing the man, I would probably take the same tactic, but that is a tactic that counsel chooses to adopt. It is a calculated piece of business. It is a clear indication that he is familiar with the case. It is a clear indication that he is familiar with the problems involved in the case. It is a clear indication that he seeks to take advantage of what there is to be taken advantage of, and in doing so, as frequently happens, there are some risks involved.

I think that what you say about the tactic adopted is a logical one, and in fact if it is a trial tactic, I just don't think that he can be heard to complain about it now.

I haven't gone over very carefully how I handled this matter, but I think that I handled this matter—

MR. PROPPER: It begins on Page 111 of that appendix we attached, your Honor, near the bottom, 350–111.

THE COURT: Mr. Weiss, what is the posture of this? This is a 2255 matter?

MR. WEISS: Yes.

THE COURT: He raises this question in the face of this record. What difference does it make that he would testify now?

MR. WEISS: He would testify as to what his subjective feeling was about the circumstances surrounding the making—

THE COURT: He had an opportunity to do that. He had an opportunity to do that at the hearing. The hearing was outside the presence of the jury. Do you remember? We had the hearing outside the presence of the jury. I took examination of Wilson. And I was concerned about it. And I concluded that he had not been over-reached. As you say, counsel said he had no objection to that, and it was obvious to me why.

You make a proffer that presently he would testify that at the time he left the hospital he was under arrest?

MR. WEISS: Yes, your Honor, and that there were circumstances surrounding his signing of the statement which amounted to undue pressure upon him, and that he was told that he could leave after he signed the statement. Some of his wife's family were in the hospital. There was certain hostility that existed between the defendant and his wife that the family knew about, and he wanted to get out of the police station and away from the family, so he signed the statement in order to—

THE COURT: What do you have to say?

MR. PROPPER: Your Honor, besides the appendix as attached, I have cited in my response various other parts of the transcript.

It was stated in the motion that he was under questioning for four hours, and in fact he was not. He was in the station house for four hours, but there was a total of twenty questions asked that take up only two and a half pages—the entire transcript. The questions are quoted in the transcript. They are not coercive at all. The police officer testified that he stayed in the station afterwards for some reason, which he doesn't know, until 5:00 in the morning. He wasn't arrested, and he left voluntarily by himself after the questioning. He was not placed under arrest at all. And the officers in fact took everybody who had any knowledge of that crime—there was another witness also—down to the station also. And they gave a statement also.

I don't see any purpose in the testimony. Subjective feelings, while a factor, certainly should have been brought up at trial, but it is not the only factor. The factor is was this man at that time in custody, and was

he a suspect. And the officer testified both at trial and in the hearing. He didn't even know what was happening when he got to the hospital. There was a radio run. He found out it was the victim's husband. He had blood on him. He asked him, "How did she die." He asked to come down and simply testify. He wanted to find out the facts of the crime.

In fact, after he spoke to him, he went out and started looking for a weapon. This man wasn't even present at the time.

So, I see no reason at all now to try to bring up his feelings, because your Honor at that time found no violation, and in fact counsel had no objection to it.

And I think there are two separate issues. Not only did he have no objection to it, but there was no violation, because there is no Escobedo problem in that he was not a suspect. Both persons were questioned. There were general on-the-scene questions, but it was easier to do at Homicide than the emergency room of the hospital.

And he was let go after that. He was not arrested. I see no function in any testimony now. It would only be selfserving.

THE COURT: I deny your motion.

MR. WEISS: May we approach the bench, your Honor, off the record?

(Discussion at bench off the record.)
(In open Court.)

THE COURT: I deny your motion.

## APPENDIX B

THE COURT: Is there any question about the statements?

MR. WILLIAMS: No, no questions about those, as to their admissibility.

THE COURT: But—

MR. WILLIAMS: I am not going to object to their admissibility. I was told on discovery that, and I have a copy of the written statement, and I was told by Mr. Harris when I talked about discovery in this case, that the oral statement was given, the same as a written statement.

Now, if something comes out in that oral statement that is not in the written statement, I would certainly object.

THE COURT: Is it cumulative?

MR. HARRIS: I do not say it is cumulative. I say it is briefer.

THE COURT: Are you saying, substantially so?

MR. HARRIS: I would say substantially so. There might be one or two small differences. The differences I intend to use in my case, one of the differences I think of, right now, is that he stood outside my house and waited for a cab, and I think in the written statement, he says he walked to the bus stop.

There is another one, and I'm not quite sure where it is, right now. It is no larger difference, maybe it has to do with, I think in the written one, he said he found her lying on the ground. And I think in the oral one, he said she was walking toward him, and he grabbed her.

MR. WILLIAMS: If that is all it is, I have no objection to that.

\* \* \* \* \* \*

Q Did you notice the manner of Mr. Johnson, there?

A Well, he seemed fairly calm to me. He wasn't upset.

Q Did you have any conversation with him?

A Yes, sir.

Q Was it at that time?

A Yes, sir.

Q Was it there in the waiting room?

A Yes, it was.

Q What was the conversation which you had with the defendant?

THE COURT: Wait a minute. Before we get into that, come up here.

(AT THE BENCH IN A LOW MONOTONE.)

THE COURT: Is this the type matter that I should hear, out of the presence of the jury? You say you do not object to its admissibility.

MR. WILLIAMS: Your Honor, I would like to hear it, outside the jury.

THE COURT: I thought, under the circumstances, I want to know why Wilson was there.

MR. HARRIS: I will inform the Court.

THE COURT: Sir?

MR. HARRIS: I will inform the Court. They had been notified, Margaret Johnson was dead, and apparently, from violent causes, and they came there to investigate it. They were aware, already, what the defendant had said, such as the Court has heard, already.

THE COURT: How were they aware of it?

MR. HARRIS: I think they had spoken to Mr. Jones, and he told them he had found the defendant with her. I do know what came out of it, that they wanted to know what happened. He told them exactly what the Court has come to understand; that he left his wife at the club, and he received a call from her that she was coming home by cab or bus, and he went outside and waited, and no one came, and he went around the corner, and he saw her and he knows nothing about it.

They took him back to the Homicide and typed a statement, as the formality goes.

MR. WILLIAMS: They were not aware of the story before they talked to Johnson.

THE COURT: What I am concerned with—

MR. HARRIS: Of course not.

THE COURT: What I'm concerned with, all I want to know, is that Jones came on the scene, and Johnson said, this woman was his wife.

All I want to know, is whether or not, at the time Wilson talked to this man, that inquiry, or any inquiry, had focused on him. Apparently, that is not so. There is nothing in the record that points to that, if that is so.

MR. WILLIAMS: Other than the police officer's testimony.

THE COURT: You know the general suspicions that are direct to the surviving spouse, and out of an abundance of caution, if you want me to, I will examine him in those terms, and find out. Certainly, he isn't in custody, he is interrogating him, and I do not think this is conclusive. If this man had been zeroed in, if, at the initial stages—

MR. HARRIS: Well, of course the Court and Mr. Williams have heard testimony from Sergeant Boyd, Lieutenant Smith and Lieutenant Buch, and he wasn't, even under the circumstances, the next morning.

MR. WILLIAMS: He was let go, after this.

THE COURT: I beg your pardon?

MR. WILLIAMS: He was let go, after that.

THE COURT: I understand that. What I want to know, and Wilson is an honest officer and he will tell me. It is not so important that they let the man go. If, for instance, a police officer is investigating, and the investigation is focused on a man, he is a prime suspect, and I don't think they can elicit statements from him, as a suspect by way of remarks of not putting him in custody, if they are satisfied, they can get him, and I do not think they can avoid whatever happens, and they are there to inform him, just by foregoing the formality of placing him under arrest.

I think anybody would agree with me on that. I am satisfied this man was not. In terms of Walker, whether or not that investigation focused on him, at the initial point of the investigation, and he is asking this boy—well, I will hear from Wilson and see how he approached him.

(END OF BENCH. IN OPEN COURT.)

THE COURT: Ladies and gentlemen of the jury, you will take your luncheon recess at this point. Between now, and then, do not let anybody discuss this matter with you.

(The jury left the courtroom at 12:25.)

OUT OF THE PRESENCE OF
THE JURY

THE COURT: Mr. Wilson, you may resume the stand.

(The witness did as directed.)

THE COURT: Maybe I can telescope this. It is near the luncheon period and I know what I want to find out. So, if you do not mind my getting to it.

MR. HARRIS: It is very gracious of Your Honor. I don't mind, at all. Thank you.

THE COURT: Mr. Wilson, you were working 12:00 midnight tour of duty on the 22nd?

THE WITNESS: The 22nd.

THE COURT: Your attention was called to the death of this woman, in what fashion? How did you receive it?

THE WITNESS: We received a radio call for a death at the hospital center, at 1:15 in the morning.

THE COURT: You got a routine response to the Homicide Squad Office, at the Hospital Center?

THE WITNESS: Yes, sir.

THE COURT: Tell me what happened when you got there. How did you meet up with Mr. Johnson?

THE WITNESS: They were on a routine call, and we didn't hurry, at all. It took us about 15 minutes. We got there about 1:30. I was working with Sergeant Hack. I guess, I might say we wandered in and approached one nurse, I don't know who, and asked, what they had?

If I remember correctly, they said there was a lady who was just brought in, that had been stabbed and had died. Sergeant Hack asked where she was, and they said she was in one of the treatment rooms in the back, and I believe a uniformed man stayed with this lady's husband.

And I immediately approached him and told him who I was, and asked him what happened, and he proceeded to tell me his version of what happened, not in great detail, at that time. Later, a statement was taken down in writing.

THE COURT: Now, let me ask you this question. Were there some other witnesses, and statements, taken down in writing, too?

THE WITNESS: Mr. Jones; just the two of them there, at that time.

THE COURT: When you saw these people, did you have any notions about—well, had the finger of suspicion begun to point to anybody, when you saw him?

THE WITNESS: No, sir.

THE COURT: Let me ask you: when you asked him what happened, did you anticipate that he might have told you something that might have incriminated him?

THE WITNESS: No, I didn't know what was happening to him. I didn't know what had been the cause of death. I saw he had considerable blood on him, which is not unusual, even in natural death. We recover hundreds of them.

I approached him, merely to get the information as to what had caused his wife's death. I didn't know if she had been stabbed, shot, or what, or struck, or had fallen and hemorrhaged, and there was some internal disorder.

THE COURT: Do you want to ask any questions?

CROSS–EXAMINATION

BY MR. WILLIAMS:

Q Officer, didn't you just say that you talked to a nurse and she told you, a woman had been stabbed, before you talked to Mr. Johnson?

A I might have said that. I can't recall. Maybe I did. I really don't know.

Q You might have known this, before you talked to him, that his wife had been stabbed?

A I might have. I just can't recall.

REDIRECT EXAMINATION

BY MR. HARRIS:

Q Did Sergeant Hack say anything to you, when you spoke to the defendant, or did he go elsewhere?

A He went back to the room where he examined the body.

Q You, of course, work as a team, do you not?

A Yes, sir.

Q At that time, would you say his function was to find out, directly, what happened to the deceased?

A That would be his function.

Q And what was your function?

A Trying, starting to get information as to the cause of death.

Q At that time, you said you had no knowledge, at all, on your own?

A No, sir.

Q But, possibly, you might have heard?

A I might have; I couldn't say for sure.

MR. HARRIS: I have nothing further.

MR. WILLIAMS: Just one other question, Your Honor, please.

RECROSS–EXAMINATION

BY MR. WILLIAMS:

Q You say, the oral statement he gave at the hospital, was in much greater detail than what he gave at the Homicide Squad?

A No, just the reverse. The one I took, the statement I took at our office, was in much more detail than what we learned, there at the hospital.

Q Is this a copy of the statement you took from him? The two pages? Is that what you refer to as the detailed statement?

A Yes, sir, that is right.

MR. WILLIAMS: I have no further questions, Your Honor.

MR. HARRIS: I have no other questions of this witness, Your Honor.

THE COURT: All right. Thank you. You may go to lunch, and be back at 1:45.

(Whereupon, the witness left the stand.)

APPENDIX C

Q And you saw Mr. Johnson with Mr. Collie Jones?

A I did.

Q In the waiting room of that hospital?

A Yes, sir.

Q I believe you said that you had a conversation with him at that time?

A I did.

Q Would you tell us what that conversation was, please?

A Mr. Johnson told me that he had left his wife at a restaurant in the—on Ninth Street, Northwest, and had gone home because he had to be at work the following day.

He stated that he went home, and that it was sometime later, he didn't know exactly how long, he received a 'phone call from her, saying she would be home, either by cab or bus.

He said that he got dressed and went outside. His wife wasn't out there, so he walked down to the bus stop.

When he got near the bus stop, he looked up towards New Hampshire and Crittendon and he saw a woman staggering in that area, down the corner.

He said that he went up there and found his wife. She had been stabbed.

He stated that shortly thereafter people started gathering. He asked for help, and Mr. Jones came along and they placed her in his car.

He offered to take them to the Hospital Center or a nearby hospital and they did take her to the hospital, where she expired.

Q Where did he say that he left his wife, when he was talking to you at the hospital?

A I don't recall if he told me right off, but he said that it had been at a bar or a cafe. I don't recall whether he named it at that time or not.

Q Did he say he left her in the place?

A I think he said in front of the place.

Q And she telephoned him at home?

A That is right.

Q   And told him that she was going to take a car or bus?

A   A cab or bus.

Q   What did he say he did?

A   He stated that he got dressed, went out, and she didn't come by cab. So, he walked down to the bus stop.

Q   How was it that he said that he found her?

A   He stated when he got—I think it's the bus stop at New Hampshire and Decatur, when he got—

THE COURT: You asked him what he said and he told you what he said. Now you are asking him all over again. Why?

MR. HARRIS: I was just pointing up those three things, Your Honor. Then I will continue on to the next thing.

BY MR. HARRIS:

Q   How was it that he said he found her?

A   He looked up and saw her staggering on the corner, or saw a woman staggering on the corner of New Hampshire and Crittendon.

He walked up there and found his wife.

Q   Now, on conversing with Mr. Johnson there at the hospital, were you able to form an opinion as to his sobriety?

A   He appeared to be sober to me. I didn't notice anything that I would say that he was intoxicated or would lead me to believe he was.

Q   Did you examine this item, Government's Exhibit Number Three, a green leather billfold?

A   This one?

Q   Detective Wilson, have you ever seen this green leather billfold before?

A   Yes, sir; Mr. Johnson had it in his hands at the hospital.

Q   Did you see any blood on it at that time?

A   Yes, there was.

Q   Would you examine it now, sir?

(Witness complied)

Do you see anything on it now?

A   I see what appears to be blood on it now.

Q   Tell us how much blood it had on it, this leather billfold, when you saw it with Mr. Johnson there at the hospital?

A   I would say that the blood was more noticeable at that time. It wasn't dried out. But his hand was bloody. I think probably the blood had come from his hand that was on this billfold.

Q   Did you discuss with him where he had gotten this when he gave it to you at the hospital?

A   I don't think I did at the hospital.

Q   Would you examine these two items, Government's One for identification and Government's Two for identification, the white umbrella and the straw purse?

A   Yes, sir.

Q   Have you ever seen those before?

A   I saw them at the office, yes.

Q   When did you see them at the Homicide Squad Office?

A   I guess it would be the following day.

Q   Was that the first time that you had seen them?

A   Yes, sir, to my knowledge, it was.

Q   I take it then that you did not see them at the hospital?

A   No, sir, I did not.

Q   Incidentally, about what time was this that you saw the defendant Joseph Johnson there at the hospital waiting room with the green purse?

A   I would say around 1:30–1:35 in the morning.

Q   There at the hospital, did you ask him if his wife had been carrying anything else, or if he found any of her property at the scene, other than the green leather billfold?

A   No, I do not recall asking him that.

Q   Now, there came a time that you and Mr. Johnson left the hospital, is that correct?

A   Yes, sir.

Q   Where did you go?

A  To the Homicide Office.

Q  At that time, did you in any way suspect complicity on the part of Mr. Johnson in connection with his wife's death?

THE COURT: Read that question back.

(the reporter complied)

THE WITNESS: As far as I was concerned, he was being taken down there to give a witness' statement. I had no reason to suspect him.

BY MR. HARRIS:

Q  When you went with the defendant Joseph Johnson to the Homicide Squad Office, did you take a witness statement from him?

A  Yes, sir, I did.

Q  Was that a typed statement that he signed?

A  Yes, it was.

Q  Do you have a copy of that statement here with you?

A  I do.

Q  Will you tell the Court and jury, please, what it was that the defendant told you in this witness statement that you took from him at the Homicide Squad Office?

MR. WILLIAMS: I will object if the officer can not recollect.

I presume that the United States Attorney is using this as a memorandum to refresh. I would think that he would have to exhaust the officer's memory of that statement before he could use it to read from.

THE COURT: Did he tell you anything down at the precinct that he didn't tell you at the hospital?

THE WITNESS: Yes, sir.

THE COURT: What was it?

THE WITNESS: He told me the actions, where they had been prior to going to the cafe, the name of the cafe, he named the party that his wife talked to in there, he named about the time he had left the place. He repeated about the 'phone call, how he found his wife, and then he answered several questions that I propounded to him.

MR. HARRIS: If I may, Your Honor, can I just ask the officer what exactly was it that the defendant told him, and proceed from there?

THE COURT: Sir?

MR. HARRIS: If I may, I would like to ask the Officer what it was that the defendant told him at the Homicide Squad Office?

THE COURT: Do you want him to read the whole statement?

MR. HARRIS: No, Your Honor. I want to have him just testify as to what the defendant told him, including the questions that he asked and the answers that he gave. I don't intend that he read the whole statement.

If he can testify from memory, I would be pleased if he would.

THE COURT: Tell us what he told you, Mr. Wilson.

THE WITNESS: He told me that he and his wife had gone out on the Friday night. They had gone to some friend's home over on Northeast. I think their name is Cain. They had a couple of beers there and then had left and gone to the Hollywood Cafe, which is on Ninth Street, Northwest, I think in the vicinity of Ninth and U.

They went there and had a couple of more beers. His wife talked with a friend of hers who was employed there.

He stated that he had to go to work the next day. He was employed as an apprentice butcher, I think, at a Safeway Store on Connecticut Avenue; that he decided to go home and his wife decided to remain at the—in the cafe or go visit other friends.

He stated that he caught a cab and went home. He wasn't sure exactly when he got home, but I think it was right around 11:00. He went to bed.

Sometime after 12:00, he was not positive, he received this 'phone call from his wife.

At that time, she stated that he was—she was starting on her way home, either by cab or bus.

He stated that he got dressed and went outside and waited a moment or so and the cab did not come.

He then walked down to the corner of Crittendon and Decatur—New Hampshire and Decatur—and looked back up and he saw this woman at the corner of New Hampshire and Crittendon.

He went up there and found out it was his wife. She fell over, I believe he said. He helped her up and was trying to assist her when this crowd gathered.

Mr. Jones came along. He asked several people to assist him in taking her to a hospital, that she was hurt, and nobody but Mr. Jones offered to assist him. And they put her in the car and they went to the Hospital Center.

I then asked him about how long they had been married, where he worked, and I believe I asked him the name of the party that he had seen at the Hollywood Cafe.

BY MR. HARRIS:

Q Sergeant Wilson, do you recall exactly what the defendant told you with reference to what he did after he left the Cain residence?

A I think he said they went right to the Hollywood, if I am not mistaken.

Q Do you recall exactly what the defendant told you there in the Homicide Squad about how his wife was, where she was, when he found her or came on her?

A In the statement that I took from him, I think he said she was on the ground, rolling around on the ground, if I am not mistaken.

Q Now, you say you asked him several separate questions and took down the questions and the exact answers that he gave to you, did you not?

A Yes, sir.

Q Do you recall exactly what those questions were, how many there were, and exactly what he said in response to them?

A I guess there were probably 15 or 20. I don't recall them all right now.

MR. HARRIS: If the Court please, could the officer refresh his recollection by referring to the notes that he has in front of him?

THE COURT: He may.

BY MR. HARRIS: Using the notes to refresh his recollection, may I have the officer tell the Court and jury the exact questions and the exact answers?

THE COURT: You may.

MR. HARRIS: Thank you, Your Honor.

BY MR. HARRIS:

Q Will you please do so, Sergeant Wilson?

A I asked him a series of questions; the first question: Have you been drinking enough to be drunk?

"I only had four beers and was not drunk."

"Had your wife had more to drink than you and was she drunk?"

"She had more than I did, but I do not think she was intoxicated."

"Have you had some trouble with your wife in the past?"

"Yes; we were separated for about three months, and had been back together for a month and a half."

"Does your wife have any boyfriends that you know of?"

"Not that I know of."

"When she called you on the 'phone, did she say who she was with or where she was?"

"No, sir, she did not."

"From the time she called you on the 'phone until you went on the street and found her, how much time about elapsed?"

"I do not know, but it was not long."

"Did your wife carry a purse?"

"She carried a little green wallet, that I found on the ground near her."

"Do you have any children by Margaret?"

"Yes we have a boy. He is at her mother's at 915–3rd Street, Northwest."

"Have you ever cut your wife or had trouble with her?"

"We have fussed, but I have never cut her. I have slapped her occasionally."

"Do you carry a knife?"

"No, I do not."

"Do you know where your wife went after you left her at 9th and U Street?"

"I do not know."

"Does she ever leave you like that on other occasions?"

"We have always done that. She would go her way and I would go mine."

"Have you had any argument tonight?"

"We had not had an argument for about two months, except for a small one when her mother had her family reunion."

"Do you know the man who took you and your wife to the hospital?"

"No, I do not."

"Do you know any of the people who were on the scene when your wife was found?"

"No, I do not."

"How long have you lived there?"

"About seven months."

"Did your wife work?"

"She was employed at the Masonic Eastern Star Home, 6500 New Hampshire Avenue."

"Have you had your wife at that bus stop before?"

"Yes; she often called me and asked me to meet her there."

"Do you have any knives missing from your house?"

"Not that I know of."

"Did you see anyone when you left the house?"

"There was some woman on the front steps. She was looking for someone, but I do not recall who."

"Did you see any other vehicles, like cabs, in the area when you went to meet your wife?"

"No, I did not."

"Did your wife have any enemies or others who would kill her?"

"Not that I know of."

"Had you ever left her at the Hollywood before?"

"No, sir."

"Did you see anyone in the Hollywood that you knew?"

"Yes; we saw a girl there named Nancy, who was a friend of my wife's uncle."

"Is there anything else you wish to add to your statement?"

"No."

"Did you stab her?"

"No, I did not."

The statement was signed. The statement was given to and typed by John Wilson—Detective Sergeant John C. Wilson, and signed by Joseph Terry Johnson.

Q Now, Sergeant Wilson, when you finished taking this formal statement from the defendant, did he remain in the station house?

A Yes, he did.

BAZELON, Chief Judge, concurring in result:

I concur in affirming the district court's denial of appellant's petition to vacate sentence under 28 U.S.C. § 2255 (1970). Although the *Miranda* issue presented by appellant is difficult, the district judge did explore the admissibility problem both at trial and at the § 2255 hearing.[1]

Appellant urges this court to remand the case for a full evidentiary hearing so that he might testify as to his "subjective feeling" concerning the circumstances surrounding the making of the station house statement.[2] Finding appellant's proffer insufficient to warrant such a remand in light of the circumstances that appear on the

1. *See* Appendices A and B, *supra* pp. 9–19.

2. *See* Appendix A, *supra* pp. 9–12.

record before us, I concur in the result reached by the court.[3]

I am troubled, however, by the majority's reliance on a finding of deliberate bypass to the extent that it suggests that counsel may effect a waiver of such an important right as was involved here,[4] absent any indication that counsel ever consulted with appellant or informed him of the existence of such right.[5]

It is clear that counsel offered no objection to the introduction of testimony concerning appellant's station house statement. As the opinion points out, the trial judge

---

3. Appellant contests only the introduction of testimony relating to his station house statement, and in no way challenges the introduction of testimony concerning the statement he made at the hospital. While the statements are not exactly identical, the station house statement being the more detailed of the two, the damaging import of appellant's version of the facts was as apparent in the hospital statement as in the station house statement. In its summation to the jury the prosecution did not rely solely, or even more forcefully, on the effect of the station house statement—some evidence at least of the insignificance of the differences between the two statements. It thus can be argued that appellant could not have been materially prejudiced by the introduction of testimony concerning the station house statement. *See Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (affirming the denial of habeas corpus relief, without reaching the merits of petitioner's claim challenging introduction of a post-indictment, pretrial confession, finding that any possible error would be harmless beyond a reasonable doubt, in light of three other unchallenged confessions and strong corroborated evidence of guilt). *Accord, Hasson v. United States,* 81 U.S.App.D.C. 333, 158 F.2d 330, *cert. denied,* 331 U.S. 808, 67 S.Ct. 1187, 91 L.Ed. 1829 and 337 U.S. 932, 69 S.Ct. 1484, 93 L.Ed. 1738, *reh. denied,* 337 U.S. 962, 69 S.Ct. 1521, 93 L.Ed. 1760 (1949). *But see LaShine v. United States,* 126 U.S.App.D.C. 71, 374 F.2d 285 (1967).

4. *Miranda* warnings are required to assure that a defendant is aware of the privilege against compulsory self-incrimination because "[t]he Fifth Amendment privilege is so fundamental to our system of constitutional rule . . . ." *Miranda v. Arizona,* 384 U.S. 436, 468, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694, 720 (1966). The Supreme Court has referred to this right as "the mainstay of our adversary system of criminal justice," *Johnson v. New Jersey,* 384 U.S. 719, 729, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882, 890, *reh. denied,* 385 U.S. 890, 87 S.Ct. 12, 17 L.Ed.2d 21 (1966), and as " 'one of the great landmarks in man's struggle to make himself civilized.' " *Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511, 518, *reh. denied,* 351 U.S. 928, 76 S.Ct. 777, 100 L.Ed. 1457 (1956).

5. Supreme Court decisions do not provide any clear standard clarifying the circumstances in which the defendant's participation in the waiver decision is essential. Welsh White, "Federal Habeas Corpus: The Impact of the Failure to Assert a Constitutional Claim at Trial," 58 Va.L.Rev. 67, 70 (1972). In attempting to interpret Supreme Court doctrine and to reconcile *Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), with *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), courts have relied on a variety of factors—including the fundamental nature of the right involved, the existence of "exceptional circumstances," the demands of judicial economy and efficiency, and the degree to which strategic considerations entered into the decision—in allocating decision-making authority between attorney and client. *See,* Comment, "Federal Habeas Corpus and the Doctrine of Waiver through the Deliberate Bypass of State Procedures," 31 La.L.Rev. 601 (1971); Grano, "The Right to Counsel: Collateral Issues Affecting Due Process," 54 Minn.L.Rev. 1175 (1970); Note, "Developments in the Law—Federal Habeas Corpus," 83 Harv.L.Rev. 1038 (1970); Comment, "Criminal Waiver: The Requirements of Personal Participation, Competence and Legitimate State Interest," 54 Calif.L. Rev. 1262 (1966); Wright and Sofaer, "Federal Habeas Corpus for State Prisoners: The Allocation of Fact-Finding Responsibility," 75 Yale L.J. 895 (1966).

It is generally recognized that the entering of a plea, the waiver of a right to a jury trial, and the decision not to appeal, for example, are viewed as decisions requiring the participation of the accused. *See* Comment, 54 Calif.L.Rev., *supra,* and cases and statutes cited therein, at 1268. In this circuit, the participation of the defendant has also been required where counsel seeks to waive trial on all issues except insanity, *United States v. Brown,* 138 U.S.App. D.C. 398, 428 F.2d 1100 (1970); where the right to be present at trial is forfeited, *Cross v. United States,* 117 U.S.App.D.C. 56, 325 F.2d 629 (1963); where counsel stipulates that his client had a prior felony conviction, the effect of which would be to increase the maximum imprisonment, *Jackson v. United States,* 95 U.S. App.D.C. 328, 221 F.2d 883 (1955); and where a waiver of the right to testify is at stake, *Poe v. United States,* 233 F.Supp. 173 (D.D.C.), *aff'd,* 352 F.2d 639 (D.C.Cir.1965). *See also United States v. Moore,* 529 F.2d 355, 358 (D.C. Cir.1976). *Cf., Haziel v. United States,* 131 U.S.App.D.C. 298, 404 F.2d 1275, 1278 (1968).

was particularly sensitive to the possible *Miranda* problem. By exploring the issue with counsel at trial, the judge assured himself that the failure to object was an informed tactical decision rather than an inadvertent omission, thus obviating the need for a remand for an evidentiary hearing to determine whether counsel made a deliberate strategic waiver.[6]

The transcript here, however, is devoid of any reference[7] which provides a reliable basis for concluding that appellant approved of the waiver on his behalf.[8] While on occasion decisions during the heat of trial may involve "nice calculations of pro-cedural complexities and jurors' likely reactions"[9] which make consultation unfeasible, ordinarily "we rely upon counsel to speak for his client not because we believe the attorney must make the decision, but because we assume the attorney has consulted with his client, advised him of what is at stake, and helped him toward a wise decision."[10]

In summary, the record does not demonstrate that appellant was apprised of counsel's intention to acquiesce in the admission of the now-disputed testimony, and of the potential consequences of such action, al-

---

6. *Henry v. Mississippi, supra.* The district judge's initiation of this inquiry at trial also eliminated the possible need for a remand had appellant claimed that his counsel had been ineffective in not considering whether there might be a *Miranda* problem, *United States v. DeCoster*, 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973). Such action by trial judges assists them in discharging their duty "to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts," *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 773 (1970), and is especially important in light of the uneven quality of representation available to criminal defendants. *See, e. g.,* Chief Judge Irving R. Kaufman, "Does the Judge Have a Right to Qualified Counsel?," 61 A.B.A.J. 569 (1975); Chief Justice Warren E. Burger, "The Special Skills of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?," 42 Ford.L.Rev. 227 (1973); Chief Judge David L. Bazelon, "The Defective Assistance of Counsel," 42 U.Cinn.L.Rev. 1 (1973); Judge Edward A. Tamm, "Advocacy Can Be Taught—the N.I.T.A. Way," 59 A.B.A.J. 625 (1973); Joel Finer, "Ineffective Assistance of Counsel, " 58 Corn.L.Rev. 1077 (1973). *See also* Note, "Providing Counsel for the Indigent Accused: The Criminal Justice Act, Part I," 12 Amer.Crim.L.Rev. 789, 821–829 (1975).

*Cf.,* Michael Tigar, "Waiver of Constitutional Rights: Disquiet in the Citadel," 84 Harv.L. Rev. 1, 18 (1970), proposing that *Fay v. Noia* and *Henry v. Mississippi* suggest "that a lawyer is permitted to make relatively minor and understandable mistakes on behalf of his client, but not major and unexcusable ones," the waiver question thus turning on "an assessment of the significance of a procedural right to the proper defense of an accused. Interpreted in this way," the author suggests, "*Fay* makes the issue of allocation of decisions between attorney and client nearly coextensive with that of competence of counsel."

7. Appellant's silent presence should not be construed as acquiescence in his counsel's action since it is totally unrealistic to assume that appellant, unschooled in the law, realized the import of the colloquy between his counsel and the court. *See Himmelfarb v. United States*, 175 F.2d 924, 931 n. 1 (9th Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949), holding that no stipulation of counsel waiving his client's constitutional right not to be placed twice in jeopardy for the same offense could be effective without the client's specific assent. "The mere silence of an accused or his failure to object or to protest a discharge of the jury cannot amount to a waiver of this immunity. 'It would be a harsh rule to hold that defendant consented to a withdrawal of the case from the jury simply because he interposed no objection.' *State v. Richardson*, 47 S.C. 166, 25 S.E. 220, 222, 35 L.R.A. 238. There must be more in order to overcome the presumption [against the waiver of fundamental rights by an accused]." *See also State v. Mendes*, 210 A.2d 50, 55 (R.I.1965). *But see United States ex rel. Garcia v. Follette*, 417 F.2d 709, 713 (2d Cir. 1969) and Comment, 31 La.L.Rev. 601, *supra*, n. 5, at 603, n. 15.

8. Although noting that the trial record disclosed that "appellant's counsel did not object to the admission of the confession," the court in *United States ex rel. Snyder v. Mazurkiewicz* remanded for an evidentiary hearing on the question of waiver since the record was "equally devoid of any discussion or dialogue from which any conclusion of waiver by the appellant may be convincingly demonstrated." 413 F.2d 500, 502 (3d Cir. 1969) (footnote omitted). *See also United States ex rel. Gockley v. Myers*, 378 F.2d 398 (3d Cir. 1967).

9. *Haziel v. United States, supra* n. 5, at 1278.

10. *Id.*

though it does indicate that there was ample opportunity for consultation.[11] In these circumstances counsel's decision, however purposeful, should not preclude appellant from raising his *Miranda* claim in a proceeding for collateral relief. Counsel's duty to communicate with his client is gaining increasing recognition,[12] and should not unnecessarily be relaxed.

I therefore join in affirmance based on the insufficiency of appellant's proffer[13] and the lack of evidence of material prejudice,[14] rather than on a finding of deliberate bypass.

---

**11.** Where there is such opportunity, there would be "little loss of either judicial or advocate efficiency"—the "principal ground by which courts have sought to justify the binding effects of a nonpersonal waiver"—if the accused participates in the decision. Comment, 54 Calif.L.Rev., *supra*, n. 5, at 1269, 1271. *See Nelson v. California*, 346 F.2d 73 (9th Cir. 1965).

Limiting counsel's ability to bind his client by a waiver decision in which the client did not participate to situations in which the exigencies of litigation demand that immediate choices be made is frequently recommended. *See, e. g.,* Wright and Sofaer, *supra* at 973 ("There is no reason to give attorneys more power to waive defendants' rights than they need in order to represent their clients effectively. When the decision to be made does not require a speedy judgment or involve factors which are beyond the ordinary defendant's ability to understand, consultation should normally be necessary."). *See also Tollett v. Henderson*, 411 U.S. 258, 271 n. 2, 93 S.Ct. 1602, 1610, 36 L.Ed.2d 235, 246 (1973) (Marshall, J., dissenting). "If . . . a rule [that an attorney's decision not to raise a constitutional objection in which the defendant does not participate may sometimes preclude successful reliance on the constitutional claim] is to be squarely adopted by this Court, it should be limited narrowly to situations in which practical realities bar consultation, as often may happen during the course of trial."

Cf. *Murch v. Mottram*, 409 U.S. 41 [93 S.Ct. 71, 34 L.Ed.2d 194] (1972)."

**12.** In *United States v. DeCoster, supra*, n. 6 at 1203, we noted, *inter alia*, that counsel should "confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable"; "discuss fully potential strategies and tactical choices with his client"; and "promptly advise his client of his rights and take all actions necessary to preserve them." *See also Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir.), *cert. denied*, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968).

ABA Standards dictate that after "informing himself fully on the facts and the law, the lawyer should advise the accused with complete candor concerning all aspects of the case, including his candid estimate of the probable outcome." American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Defense Function, § 5.1 (App. Draft 1971). *See also* §§ 5.2(b), 5.2(c), and 3.8 and the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Post-Conviction Remedies, p. 37 (App.Draft 1968).

**13.** *Supra*, p. 1.

**14.** *Supra*, n. 3.