**UNITED STATES of America**

v.

**Bennie E. BARNES, Appellant.**

**No. 77–2097.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 19, 1978.

Decided Aug. 20, 1979.

Robert P. Mosteller, Washington, D. C. (appointed by this Court) for appellant.

Charles L. Hall, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., and Michael W. Farrell, Asst. U. S. Atty., Washington, D. C., were on brief, for appellee.

Before BAZELON, Senior Circuit Judge, McGOWAN and ROBB, Circuit Judges.

Opinion for the Court filed by BAZELON, Senior Circuit Judge.

Dissenting opinion filed by ROBB, Circuit Judge.

BAZELON, Senior Circuit Judge.

Appellant, Bennie E. Barnes, appeals the denial without a hearing of his petition to vacate his sentence under 28 U.S.C. § 2255 (1976). The question presented is whether "the files and records of the case conclusively show that the prisoner is entitled to no relief" [1] on the claim that his statements to the police were involuntary and should not have been admitted at his trial. We reverse and remand for a hearing.

### I.

Our review of the trial transcript and record in this case reveals the following:

Shortly after noon on Saturday, March 8, 1969, appellant returned home from work. Aside from a trip to the supermarket, he and his wife spent the afternoon at home, resting and drinking whiskey. In the late afternoon, they went shopping with Mrs. Barnes' niece, Dorothy Lee Blizzard, and a male friend, Harley Davis, stopping at least twice to buy liquor. The group returned to Mrs. Blizzard's apartment on 8th Street, N.W., to consume the food and liquor they had purchased. While Mrs. Barnes cooked, Davis and the appellant went briefly to the Barnes apartment to drink some beer. On

their return, Barnes and his wife began to argue, and after Barnes slapped his wife, Davis forced him from the apartment. Later in the evening, appellant came back to the Blizzard apartment, apologized to Davis for the earlier dispute, spoke briefly with his wife, and left.

Barnes returned to the Blizzard apartment yet again after midnight, and, according to three witnesses, carried a plastic Clorox bottle under his jacket. He sat with Mrs. Barnes on a couch in the kitchen, where eight-year-old Wilhelmina Blizzard was also lying. After another argument began between the couple, Mrs. Barnes grabbed the Clorox bottle and smelled the contents. She said it contained gasoline, and threatened to call the police. According to Mrs. Barnes' statement on the day she died, appellant then poured the gasoline around her and threw a lighted match on the floor. Mrs. Barnes, who weighed over 250 pounds, stated that her husband held her in the fire; Barnes claimed that he tried to pull her out, but that she slipped and fell. Mrs. Barnes was finally dragged from the fire by Harley Davis, but not until she had received severe burns over 80 percent of her body. She died the following day. Barnes himself received second and third-degree burns on his hands and face, suffered smoke inhalation, and had difficulty seeing for a day after the fire.

At issue in this case are three statements that appellant made to the police after he emerged from the burning apartment. As Sergeant Layfield, the first policeman on the scene, approached the building, Mrs. Blizzard shouted to him that Barnes had set the fire. When Layfield asked Barnes if that were true, appellant replied, "Well, I will take the blame for it." The sergeant then said, "I am not asking you to take the blame. I am asking you if you set the fire." Barnes responded, "Yes, I did, but it was an accident." [2] Barnes' second statement was made after he had been placed under arrest and had been turned over to Officer Tropf.

---

1. 28 U.S.C. § 2255 (1976).

2. Trial Transcript (Tr.) at 17–20, 297–99.

As Tropf led Barnes from the apartment to the police car, Barnes said, "I am sorry I did it. What do you think they will do to me?"[3] The final statement at issue occurred shortly after Barnes arrived at the police station. After his rights had been read to him twice, appellant told Officer Fuksa that his wife had picked up the Clorox bottle to throw at him, that he had attempted to kiss her, and that the bottle fell to the floor and accidentally ignited.[4]

In August, 1970, appellant was found competent to stand trial after a sixty-day examination at St. Elizabeth's Hospital. The psychiatrist's report noted that Barnes had an I.Q. of 67, "which is in the defective range," and that tests showed "signs of organic brain syndrome illustrated [by] visual motor deficit resembling senility."[5] Although the hospital staff also said that appellant lacked "abstraction capabilities" and the ability to "integrate ideation,"[6] the report concluded that there was no "causal connection" between appellant's retardation and the alleged offense.[7]

At a hearing on January 18, 1971, 22 months after the fire, the district court denied appellant's motion to suppress his statements on the grounds that they had been obtained in violation of *Miranda v. Arizona.*[8] At no time during the pretrial hearing or the ensuing trial, however, did defense counsel challenge the statements as involuntarily made. After two days of testimony, the court, *at the request of the prosecution and over defense objection,* sub-

mitted to the jury the question of the voluntariness of Barnes' statements.[9] Barnes was found guilty of felony murder, first and second degree murder, and arson, and was sentenced to life imprisonment.

Barnes appealed his conviction *in forma pauperis.* Court-appointed counsel on appeal, who was not trial counsel, pressed the *Miranda* claim again; challenged Officer Tropf's testimony on the grounds that the policeman lost the notes he had taken at the time of arrest; charged that Mrs. Barnes' statements did not fall under the dying declaration exception to the hearsay rule; and claimed that the jury instruction on voluntariness was unfairly prejudicial because it unduly emphasized appellant's statements. This court rejected all of Barnes' claims and affirmed the conviction.[10]

Appellant, acting *pro se,* filed a § 2255 petition in April, 1973, on the same grounds raised in his appeal, adding only a claim of ineffective assistance of counsel. The district court denied that motion without a hearing, and this court denied leave to appeal *in forma pauperis.*[11] On November 3, 1976, Barnes filed the instant petition, this time with assistance from the Public Defender Service, directly disputing the voluntariness of his statements. The petition relied on several factors indicating that the statements were not voluntary: at the time they were made, Barnes was suffering from second and third-degree burns on his hands and face and had received no medical atten-

---

3. *Id.* at 58, 357.

4. *Id.* at 35, 313.

5. Closing Note and Summary of the Clinical Record of Bennie E. Barnes. St. Elizabeth's Hospital (Dr. Elizabeth Strawinsky, July 21, 1970).

6. *Id.*

7. Letter to Clerk, United States District Court for the District of Columbia, from St. Elizabeth's Hospital (July 17, 1970). Despite the statement as to a lack of causal connection, the hospital findings, if presented in evidence, would have provided a sufficient basis for sending the case to the jury on a plea of not guilty by reason of insanity. *See McDonald v. United*

States, 114 U.S.App.D.C. 120, 122–23, 312 F.2d 847, 849–50 (1962) (en banc). This course was never pursued by defense counsel, however.

8. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. Tr. at 579–80. *See* note 24 *infra.*

10. *United States v. Barnes,* 150 U.S.App.D.C. 319, 464 F.2d 828 (1972).

11. *United States v. Barnes,* Crim. No. 923–69 (D.D.C., Apr. 6, 1973); *Barnes v. United States,* Crim. No. 923–69 (D.C.Cir., Dec. 20, 1973) (denying motion to proceed on appeal *in forma pauperis* ).

tion;[12] he had been drinking for twelve hours before the fire and consequently was intoxicated;[13] he was mentally retarded and educationally disadvantaged;[14] he had little previous experience with the law [15] and was not given his *Miranda* warnings until after he made the first two statements; and he was in shock from the fire and from seeing his wife seriously injured.[16]

The district court rejected this petition without a hearing on the ground that Barnes presented "nothing new," stating: "[A]ll of the facts in support of his motion were before this Court during the initial proceedings and on petitioner's last *pro se* motion, as well as before the jury and the Court of Appeals."[17] Upon appeal from the district court's denial of leave to proceed on appeal *in forma pauperis,* this court granted such leave. Appellant now argues that the district court erred in not according him a hearing. We agree.

## II.

At no time has any court considered appellant's claim of involuntariness. The pretrial hearing on defendant's motion to suppress focused exclusively on whether the *Miranda* warnings were required or given, with no reference whatsoever to the question of voluntariness.[18] No mention was made of any of the factors cited in the instant petition indicating that Barnes' statements may not have been "the product of a rational intellect and a free will." *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). Similarly, the admission of Barnes' statements into evidence at trial, without more, cannot be construed as an implicit finding of voluntariness: "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." *Sims v. Georgia,* 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967). Nor can the instruction to the jury on voluntariness support the district court's ruling on this petition. Under *Jackson v. Denno,* the jury's verdict cannot be interpreted as a finding on the constitutional question of voluntariness, since such determinations can only be made by the trial judge.[19]

12. Lack of medical care was cited as part of the "totality of the circumstances" creating involuntariness in, *e. g., Greenwald v. Wisconsin,* 390 U.S. 519, 520, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (no medication offered for high blood pressure) and *United States ex rel. Delle Rose v. LaVallee,* 342 F.Supp. 567, 571, 574 (S.D.N.Y.1972) (back injury left suspect "racked with physical pain"), *rev'd on other grounds,* 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973).

13. Courts have regularly considered the influence of alcohol and other drugs in producing involuntary statements. *See e. g., Sanders v. United States,* 373 U.S. 1, 19–20, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) (narcotic drug); *Townsend v. Sain,* 372 U.S. 293, 307–09, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (drugs); *Pea v. United States,* 130 U.S.App.D.C. 66, 74, 397 F.2d 627, 635 (D.C.Cir.1967) (alcohol); *Gladden v. Unsworth,* 396 F.2d 373, 380–81 (9th Cir. 1968) (alcohol).

14. *See, e. g., Greenwald v. Wisconsin, supra,* 390 U.S. at 519–20, 88 S.Ct. 1152 (ninth grade education); *Culombe v. Connecticut,* 367 U.S. 568, 620, 81 S.Ct. 1860, 1888, 6 L.Ed.2d 1037 (1961) ("a thirty-three-year-old mental defective of a moron class with an intelligence quotient of sixty-four and a mental age of nine to nine and a half years"); *Spano v. New York,*

360 U.S. 315, 322, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (only one-half year of high school plus a history of emotional instability); *Payne v. Arkansas,* 356 U.S. 560, 567, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) ("a mentally dull 19-year-old youth"); *Fikes v. Alabama,* 352 U.S. 191, 196, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957) ("of low mentality, if not mentally ill").

15. *See, e. g., Rinehart v. Brewer,* 561 F.2d 126, 130 (8th Cir. 1977).

16. *See, e. g., United States ex rel. Delle Rose v. LaVallee, supra* at 571 (following wife's death, defendant was "in a state of severe agitation," and was "dazed and bewildered much of the time").

17. *Barnes v. United States,* Crim.No. 923–69 (D.D.C. Nov. 3, 1976).

18. Tr. 65–67, 74–76.

19. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The *Jackson* Court emphasized "[t]he danger that matters pertaining to the defendant's guilt will infect the jury's findings of fact bearing upon voluntariness, as well as its conclusion upon that issue itself." *Id.* at 383, 84 S.Ct. at 1784. The Court added that when the

■ The opinion by this court on direct appeal only discussed voluntariness as it related to appellant's contention that the jury instruction prejudicially directed attention to the statements.[20] The Government notes that this court, in rejecting Barnes' *Miranda* claim, characterized his remark to Officer Tropf as "an entirely voluntary statement."[21] That observation, however, was followed by the phrase, "since this police officer asked him no questions." The issue thus addressed was whether Barnes volunteered the remark, not whether the statement was voluntary in a constitutional sense. The opinion never discussed the claim that defendant's due process rights were violated by the admission of his allegedly involuntary statements.[22] The "files and records" of the case therefore do not reveal any prior adjudication of appellant's voluntariness claim, and the district court's denial of petitioner's § 2255 motion on that ground was erroneous.

### III.

The government contends that even if the district court ruling was in error, Barnes is precluded from raising the voluntariness question in this petition because he "deliberately bypassed the orderly federal procedures provided at or before trial and by way of appeal . . . ." Brief for Appellee at 9, *quoting Kaufman v. United States,* 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 1075 n. 8, 22 L.Ed.2d 227 (1969). Because the present record is subject to differing interpretations, however, we cannot determine whether counsel's failure to raise the voluntariness claim was an informed and deliberate strategic waiver.

Standing alone, counsel's trial conduct might suggest that his failure to object was intentional. Counsel not only remained silent when Barnes' statements were introduced; he even tried to capitalize on them by arguing that they demonstrated that the remorseful Barnes had claimed from the outset that the fire was an accident.[23] Moreover, when the prosecutor specifically raised the voluntariness issue by requesting an instruction on that question, counsel tried to prevent the charge from being given, thus rejecting yet another opportunity to have the statements excluded from the jury's consideration.[24]

jury considers both "reliability and voluntariness" of a confession, a reviewing court cannot presume "a reliable determination on the voluntariness issue which satisfies the constitutional rights of the defendant . . . ." *Id.* at 387, 84 S.Ct. at 1786. *See Sims v. Georgia,* 385 U.S. 538, 544, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967); *Lindsey v. Craven,* 521 F.2d 1071, 1072 (9th Cir. 1975); *Clifton v. United States,* 125 U.S.App.D.C. 257, 262–63, 371 F.2d 354, 359–60 (D.C.Cir.1966), *cert. denied,* 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967).

20. 150 U.S.App.D.C. at 322, 464 F.2d at 831.

21. *Id.,* 150 U.S.App.D.C. at 321, 464 F.2d at 830.

22. Nor did Barnes raise the voluntariness issue in his original *pro se* § 2255 petition. Even if he had raised the voluntariness question, however, it would not necessarily preclude action on this petition:

Denial of a motion for relief without a hearing cannot be taken as a denial on the merits for the purpose of determining whether a subsequent application based on the same ground may be summarily denied, and it is doubtful whether even a full hearing on the merits may be deemed "adequate" for this

purpose if the applicant was through no fault of his own not represented by counsel.

*Tucker v. United States,* 138 U.S.App.D.C. 345, 347, 427 F.2d 615, 617 (1970) (footnote omitted). *See Price v. Johnston,* 334 U.S. 266, 291, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948).

23. Tr. at 540–41.

24. The following discussion ensued between counsel and the court:

[PROSECUTOR]: I would propose . . a simple instruction that there is evidence of a statement in the form of an admission or confession to a police officer, and before you may consider it as evidence in the case you must find beyond a reasonable doubt that it was voluntarily given by the defendant.

[DEFENSE COUNSEL]: That would be a defense request, Your Honor. I don't want to request that. I think that draws undue attention to it.

THE COURT: I believe the cases say we must do it.

[PROSECUTOR]: That's right.

THE COURT: Because otherwise they have no right to consider it.

[DEFENSE COUNSEL]: Very well.

Tr. at 579. It is difficult to perceive the exact basis of defense counsel's objection. He may

On the other hand, counsel's pretrial efforts to have these same statements suppressed on *Miranda* grounds belies any suggestion that his repeated waiver of the voluntariness issue was an intentional trial tactic; rather, through lack of adequate legal or factual preparation, counsel may simply have been unaware that the alleged involuntariness of the statements would constitute an independent basis for their suppression.[25] Under this hypothesis, counsel's efforts at trial to turn Barnes' remarks to his advantage can be seen as only an attempt to make the best of a bad situation, the trial judge previously having held the statement admissible.[26]

These conflicting interpretations of the record can be resolved only by an evidentiary hearing in the district court. Should the court conclude that counsel's failure to raise the voluntariness issue amounted to a "deliberate bypass," it may deny relief on the ground that appellant has waived his right to collateral review.[27] If, however, the district court is unable to find that a deliberate bypass has occurred, it must then determine whether that standard, or the "narrower" "cause and prejudice" test,[28] is the appropriate waiver rule in the circumstances of this case. Because Barnes' trial predated the 1975 amendments to the Federal Rules of Criminal Procedure,[29] the express waiver provisions contained in the present Rule 12(f) are inapplicable.[30] Although we have held in similar circumstances that a procedural default

have wanted to avoid any mention of Barnes' statements in the hope that the jury would forget about them. But this interpretation seems implausible in light of counsel's remarks during closing argument urging the jury to consider all three statements carefully as supporting the accident theory. Alternatively, counsel's objection may have been to the proposed instruction's characterization of the statements as "an admission or confession," language that would suggest that Barnes had acknowledged his guilt.

25. The record contains several indications that appellant's court-appointed trial counsel, who was actually the fifth different attorney assigned to Barnes since his arrest and who was appointed less than a month before trial began, was not completely prepared. At the opening of the trial, for example, counsel stated that he had not seen the juror list for the case and that he had been unable to acquire his client's hospital records. Tr. at 4, 8. On the question of a possible insanity defense, *see* note 7 *supra.*

Moreover, as defense counsel called Barnes to the witness stand, the prosecutor pointed out that Barnes should be advised that he had the right not to testify. When the trial judge remarked that "[c]ertainly counsel must have explained it to him before this," counsel responded, "As a matter of fact I didn't. It never occurred to me. . . ." Tr. at 420. *Cf.* American Bar Association Standards Relating to the Administration of Criminal Justice: Prosecution and Defense Function § 4–5.2 (2d ed., approved draft without commentary 1979) ("The decisions which are to be made by the accused after full consultation with counsel are: (i) what pleas to enter; (ii) whether to waive jury trial; and (iii) *whether to testify in his or her own behalf.*") (emphasis added).

26. The government suggests that counsel's failure to object to the introduction of Barnes' statements was simply a concession that they were indeed voluntary. The combination of factors cited in the instant petition, however, certainly suffice to make out a colorable claim of involuntariness. *See* notes 12–16 *supra.* Absent any indication in the record that counsel actually considered and reasonably rejected the voluntariness claim, we decline to accept the government's interpretation.

27. *See United States v. Haywood*, 150 U.S.App. D.C. 247, 253, 464 F.2d 756, 762 (1972).

28. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The Court in *Sykes* expressly declined to provide a precise definition for these terms, noting only that the "cause and prejudice" standard is "narrower" than the "deliberate bypass" test of *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

29. Prior to 1975, only objections "based on defects in the institution of the prosecution or in the indictment or information" had to be raised prior to trial. Although the failure to comply with the Rule's time limits would constitute a waiver of these claims, the court "for cause shown" could grant relief from the waiver. 18 U.S.C. App. Fed.R.Crim.P. 12(b)(2) (1970). The 1975 Amendments expanded the Rule's coverage to include all motions to suppress evidence, as well. *See* Fed.R.Crim.P. 12(b)(3).

30. *Compare Davis v. United States*, 411 U.S. 233, 239–40, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973) *with Kaufman v. United States*, 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969).

forecloses collateral review under § 2255 only where it amounts to a "deliberate bypassing attributable to the defendant," [31] the district court should nevertheless consider whether the Supreme Court's recent decision in *Wainwright v. Sykes, supra,* requires us to abandon that standard in favor of the "cause and prejudice" test. *Compare Pacelli v. United States,* 588 F.2d 360 (2d Cir. 1978) (applying "deliberate bypass" standard to constitutional claim not controlled by statutory waiver provision), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979) *and Coco v. United States,* 569 F.2d 367 (5th Cir. 1978) (denying § 2255 motion on "deliberate bypass" theory) *with Sincox v. United States,* 571 F.2d 876 (5th Cir. 1978) (employing "cause and prejudice" test to evaluate effect of procedural default on § 2255 review) *and Ramsey v. United States,* 448 F.Supp. 1264 (N.D.Ill. 1978) (concluding that "cause and prejudice" standard replaces "deliberate bypass" test in § 2255 cases).[32]

■ On remand, therefore, the district court may pursue either of two procedures. The court may first determine whether Barnes' statements were voluntary and hence admissible at trial. If so, appellant is

---

**31.** *See United States v. Johnson,* 183 U.S.App. D.C. 130, 132, 562 F.2d 649, 651 (1976); *United States v. Haywood, supra,* 150 U.S.App.D.C. 247, 253, 464 F.2d 756, 762. In discussing whether the defendant should be bound by the procedural default of his attorney, one court has suggested that a distinction should be drawn between retained and court-appointed counsel:

> For clearly, an indigent person with court-appointed counsel cannot be said to have chosen his counsel and his defense in the same way that a person of sufficient means to hire and fire can be presumed to bear the consequences of his choice of counsel. The individualistic assumptions that underlie compelling a defendant to bear the consequences of his attorney's actions . . . may not be valid in a case with court-appointed counsel.

*United States v. Underwood,* 440 F.Supp. 499, 503 (D.R.I.) (citations omitted), *aff'd without opinion,* 553 F.2d 91 (1st Cir.), *cert. denied,* 430 U.S. 950, 97 S.Ct. 1590, 51 L.Ed.2d 799 (1977). Although this argument has surface appeal, it presupposes the effectiveness of retained counsel, an assumption that may not be warranted for attorneys hired by defendants of limited resources. *See generally* L. Downie, *Justice Denied* 174–77 (1971); Alschuler, *The Defense Attorney's Role in Plea Bargaining,* 84 Yale L.J. 1179, 1181–1206 (1975). In addition, this distinction is valid only if one can reasonably conclude that retained counsel, wherever possible, will consult with their clients and explain the basis for their actions. *Cf. Haziel v. United States,* 131 U.S.App.D.C. 298, 301, 404 F.2d 1275, 1278 (1968):

> In other circumstances we rely upon counsel to speak for his client not because we believe the attorney must make the decision, but because we assume the attorney has consulted with his client, advised him of what is at stake, and helped him toward a wise decision.

**32.** The government argued only that Barnes' actions constituted a "deliberate bypass," and

neither party has addressed the supervening issue of whether a procedural default short of a deliberate bypass can foreclose collateral review under § 2255. In these circumstances, and in light of the possibility that it may not be necessary for the district court to reach this question, we do not presently intimate any views on the appropriate waiver standard in this case.

The evidentiary hearing on the waiver issue will naturally focus on why counsel failed to object to the introduction of Barnes' statements on voluntariness grounds. Although the precise inquiry will depend on what standard the court deems applicable, the relevant questions might include: (1) whether the omission was, or is susceptible of being interpreted as, an intentional trial tactic, *see e. g., Henry v. Mississippi,* 379 U.S. 443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); *Satterfield v. Zahradnick,* 572 F.2d 443, 446 (4th Cir.), *cert. denied,* 436 U.S. 920, 98 S.Ct. 2270, 56 L.Ed.2d 762 (1978); (2) whether it was an advertent (conscious and knowing) decision by counsel, *see, e. g., Cole v. Stevenson,* 447 F.Supp. 1268, 1273–74 (E.D.N. C.1978); *cf. United States v. Hall,* 565 F.2d 917, 920 (5th Cir. 1978); (3) whether it was negligent or unreasonable, *see, e. g., Jiminez v. Estelle,* 557 F.2d 506, 511 (5th Cir. 1977) (dicta); *Collins v. Auger,* 577 F.2d 1107, 1110 n. 2 (8th Cir. 1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979); (4) whether it amounted to ineffective assistance, *see, e. g., Boyer v. Patton,* 579 F.2d 284, 288 (3d Cir. 1978); *Sincox v. United States,* 571 F.2d 876, 879–80 (5th Cir. 1978); *Rinehart v. Brewer,* 561 F.2d 126 (8th Cir. 1977); and (5) whether appellant was apprised of counsel's intention to acquiesce in the admission of his statements at trial, *see, e. g., Wainwright v. Sykes, supra,* 433 U.S. at 92–94, 97 S.Ct. 2497 (Burger, C. J., concurring); *id.* at 94–96, 97 S.Ct. 2497 (Stevens, J., concurring); *id.* at 113–116, 97 S.Ct. 2497 (Brennan, J., dissenting); *United States v. Haywood, supra,* 150 U.S.App.D.C. 254–55, 464 F.2d at 763–64.

entitled to no relief. Alternatively, the court may first determine whether the failure to raise the voluntariness issue either at trial or on appeal should preclude consideration of that claim in this § 2255 petition. If so, the court may deny relief without inquiring into the merits of appellant's contentions.[33]

*Remanded for further proceedings consistent with this opinion.*

ROBB, Circuit Judge, dissenting:

In 1971 the appellant Barnes was tried to a jury and convicted of murder and arson. The proof for the government, including the testimony of eyewitnesses, was that Barnes killed his wife by pouring gasoline on the floor of her room, lighting it with a match, and holding her in the flames. Immediately after the event he made three oral statements to the police, the substance of which was that he had caused the fire but it was an accident and he was sorry. At the trial he was vigorously defended by an experienced criminal lawyer. His defense, consistent with his statements to the police, was that the spilling of the gasoline and the fire were accidental.

Barnes appealed his conviction. In this court he was represented by another experienced and able criminal lawyer. The conviction was affirmed. *United States v. Barnes,* 150 U.S.App.D.C. 319, 464 F.2d 828 (1970).

The majority now proposes to retry the case, upon the newly minted theory that Barnes' statements to the police might have been involuntary, that his due process rights might have been violated by their admission in evidence, and that trial counsel's "repeated waiver of the voluntariness issue" might have been the result of "lack of adequate legal or factual preparation." Being unable to accept this theory, which I consider unrealistic, I would affirm the denial of the petition to vacate sentence.

The three Barnes statements to the police and the circumstances under which they were made are recounted in the record as follows:

1. The first statement was made to police sergeant Layfield who responded to a "radio run" to investigate trouble at 1014–8th Street, N.W., the scene of the fire. Sgt. Layfield testified:

> Upon my arrival I observed several Fire Department vehicles in the ten hundred block of the figure eight street, Northwest.
>
> *   *   *   *   *   *
>
> As I was walking down towards that address I was approached by a male and a female subject.
>
> The female subject, who was later identified as Dorothy Blizzard, said "That's the man. That's the man who started the fire."
>
> At this time I looked at the male subject, who was later identified as the defendant, and stated, "Is that true? Did you start the fire?"
>
> He says, "I will take the blame for it."
>
> I said, "Sir, I am not asking you to take the blame. I asked you if you started the fire."
>
> He said, "Yes, I did. It was an accident."
>
> At this time I placed him under arrest.
>
> Q. Now at the time that Mrs. Blizzard talked to you had you been into the premises at 1014 Eighth Street, Northwest?
>
> A. No, sir, I had not been.
>
> Q. Did you know what had happened at 1014 Eighth Street, Northwest?
>
> A. No, sir.
>
> I had not.

---

**33.** *See United States v. Haywood, supra.* The procedure outlined in the text is similar to that suggested by the Ninth Circuit in *Farrow v. United States,* 580 F.2d 1339 (9th Cir. 1978) (en banc). The court held that where a § 2255 petition alleges that the sentencing court has improperly relied upon an invalid prior conviction, the § 2255 judge may first determine the merits of the petitioner's contention, thus avoiding what may be an unnecessary evidentiary hearing on the waiver issue. *Id.* at 1356–57.

(Tr. 10, 11)

2. Sgt. Layfield turned Barnes over to Officer Tropf. Officer Tropf testified:

A. I took ahold of Mr. Barnes by the wrist and by the back and top and the rear of his trousers to take him back to the scout car.

Q. What happened then, if anything, Officer Tropf?

A. Before I could turn and leave with Mr. Barnes, a lady lying in front of 1014–8th Street, Northwest, looked up at Mr. Barnes and said to him, "You had no call to do that to me, Bennie," and then lapsed back into moaning.

\* \* \* \* \* \*

Q. Now after she said that, what, if anything, happened then.

A. After she said that, I turned with the defendant to take him back to the scout car. And while en route back to the scout car, Mr. Barnes made a statement to me.

Q. He made a statement to you?

A. Yes, sir.

Q. Did you ask him to make a statement?

A. No, sir.

Q. Had you said anything to him?

A. No, sir.

Q. What did he say?

A. He said, "I am sorry I did it. What do you think they will do to me?"

Q. Did he say anything else, sir?

A. If he did, I don't recall, sir.

(Tr. 57, 58)

3. When the patrol wagon arrived to take Barnes to the stationhouse Officer Fuksa advised him of his *Miranda* rights. At the stationhouse the officer again advised Barnes of his rights, asked him if he understood them; and Barnes said he did. The officer testified:

A. At that time I began filling out the forms which are needed, and I asked the defendant his name and his address.

And at that time he stated to me that Ella had called him over to 1014–8th Street. And he said that he responded over there and that when he arrived they got in an argument. And at this time she had picked up a plastic Clorox bottle which was filled with gasoline and was going to throw it on him. And he said to me that he acted like any man, and he tried to kiss her, and at that time the bottle dropped to the floor and ignited.

Q. Did he say anything further?

A. No, he didn't.

Q. Had you asked him anything other than his name and address?

A. No, sir, just his name and address.

Q. No other questions at all?

A. No, sir.

(J.A. 35, 36)

A friend of Mrs. Barnes, Harley Davis, dragged her out of the fire. He testified that seeing Barnes standing nearby "I asked him, I said, 'What did you do this for Bennie?' Just like that. And he said, 'I am sorry. I was wrong.' That's all he said." (Tr. 265) Within moments thereafter the police arrived and Barnes was arrested. The majority says that when he talked to the police Barnes was in such condition and subject to such handicaps that his statements to the officers may have been involuntary. My colleagues do not suggest that the statement to Davis was involuntary; yet when he made it Barnes was subject to the same conditions and handicaps that existed when he talked to the police, only moments later.

In my judgment there is no basis whatever for a contention that Barnes' statements to the police were involuntary. If they were, then I do not see how any statement could be voluntary. Barnes spoke to the police of his own volition; no one coerced or pressed him to speak, nor did any of the circumstances mentioned by the majority exert any such pressure or coercion. In my opinion what the majority considers a "waiver of the involuntariness issue" by counsel was merely a sensible decision to refrain from frivolous argument.

I think the proceedings on remand which the majority orders will be a sterile academic exercise. Accordingly I dissent.