**UNITED STATES of America,**

v.

**Bennie E. BARNES.**

**Crim. A. No. 69–923.**

United States District Court, District of Columbia.

Aug. 21, 1981.

---

Randy I. Bellows, Robert P. Mosteller, Public Defender Service, Washington, D. C., for Barnes.

Andrea L. Harnett, Asst. U. S. Atty., Washington, D. C., for the government.

FINDINGS OF FACT AND CONCLUSIONS OF LAW OF UNITED STATES DISTRICT JUDGE CHARLES R. RICHEY

CHARLES R. RICHEY, District Judge.

This matter is before the Court on remand from the Court of Appeals for a hearing on the petitioner's § 2255 motion in order to determine whether statements made by petitioner prior to and immediately following his arrest were voluntary. Alternatively, the Court of Appeals indicated that the District Court could determine whether the petitioner had effectively waived his rights to raise the voluntariness issue with respect to the three statements now in issue on this appeal.

The petitioner, Bennie E. Barnes, ("Barnes"), was tried before a jury in the United States District Court for the District of Columbia, the Honorable June L. Green presiding, in January of 1971, on a three-count indictment charging (1) felony murder, (2) first-degree murder, and (3) arson, all in violation of the District of Columbia Code. Trial after three days resulted in a conviction on all three counts and would have resulted in such, regardless of the issues set forth on this remand. This is so because of the three independent eyewitnesses to the crime. Thus, to allow this petitioner, after ten years, and three appeals, including four § 2255 motions to dream up issues already subsumed by matters previously litigated and affirmed is ridiculous in the extreme. To say that the petitioner is not guilty is to ignore the facts of testimony of Mrs. Ella Mae Barnes and the two other eyewitnesses who had no motive other than to tell the truth. To say that petitioner was denied his constitutional rights is also far fetched and ridiculous

because he was afforded able trial counsel, who faced a very difficult task to defend against the charges, as well as one of the very best and ablest appellate counsel, who approved of the choice of defense by trial counsel indirectly under attack here. (2255 Tr. 310).

■ Assuming *arguendo* that the first two statements by the petitioner were not voluntary or the product of a rational mind, what about the deceased's dying declaration and the other eyewitnesses to this heinous crime? They prove, even without petitioner's statements, each and every element of petitioner's crimes for which he was convicted beyond a reasonable doubt. It is impossible to discern how this could have turned out otherwise unless the jury believed that the burning of the deceased was an "accident." That point was vigorously argued and rejected. Thus, under our great system of constitutional government, the jury had no choice but to convict, even without defendant's "admissions or involuntary statements."

## BACKGROUND

The undisputed facts of the case are as follows:

Shortly after noon on Saturday, March 8, 1969, petitioner returned home from work. Aside from a trip to the supermarket, he and his wife spent the afternoon at home, resting and drinking whiskey. In the late afternoon, they went shopping with Mrs. Barnes' niece, Dorothy Lee Blizzard, and a male friend, Harley Davis, stopping at least twice to buy liquor. The group returned to Mrs. Blizzard's apartment on 8th Street, N.W., to consume the food and liquor they had purchased. While Mrs. Barnes cooked, Davis and the petitioner went briefly to the Barnes apartment to drink some beer. On

their return, Barnes and his wife began to argue, and, after Barnes slapped his wife, Davis forced him from the apartment. Later in the evening, petitioner came back to the Blizzard apartment, apologized to Davis for the earlier dispute, spoke briefly with his wife, and left.

Barnes returned to the Blizzard apartment yet again after midnight and, according to three witnesses, carried a plastic clorox bottle under his jacket. He sat with Mrs. Barnes on a couch in the kitchen, where eight-year old Wilhelmina Blizzard was also lying. After another argument began between the couple, Mrs. Barnes grabbed the clorox bottle and smelled the contents. She said it contained gasoline, and threatened to call the police. According to Mrs. Barnes' statement on the day she died,[1] petitioner then poured the gasoline around her and threw a lighted match on the floor.[2] Mrs. Barnes, who weighed over 250 pounds, stated her husband held her in the fire; Barnes claimed that he tried to pull her out, but that she slipped and fell. Mrs. Barnes was finally dragged from the fire by Harley Davis, but not until she had received severe burns over 80 percent of her body. She died the following day. Barnes himself received second and third-degree burns on his hands and face, suffered smoke inhalation, and had difficulty seeing for a day after the fire.[3]

The overwhelming evidence adduced at trial included the statement of Mrs. Barnes as set out above, as well as two other witnesses. The first eyewitness to testify was Dorothy Lee Blizzard. She testified as follows:

Q: Could you hear what they [Bennie and the deceased, Mae] were talking about?

1. Statement of Mrs. Barnes was held admissible as a spontaneous and excited utterance. *United States v. Barnes*, 464 F.2d 828, 831 (D.C.Cir.1972), *rehearing denied*, August 15, 1972, *cert. denied*, 410 U.S. 986, 93 S.Ct. 1514, 36 L.Ed.2d 183 (1973), ("*Barnes I*").

2. The statement made by Mrs. Barnes occurred right outside the apartment house when Officer Tropf was escorting Barnes past her and she

said to Barnes, "You had no call to do that to me, Bennie." (Trial Tr. 57).

3. These are the basic facts as set out in the second Court of Appeals decision in Barnes. *United States v. Barnes*, 610 F.2d 888, 889 (D.C.Cir.1979), ("*Barnes II*"); *See also Barnes I* at 829.

A: No. Later on they, Mr. Bennie, started talking louder and cussing, so I went back to the door to see what was happening, you know, and at that time Mr. Bennie had a quart Clorox bottle sitting on the floor, so Mae took the Clorox bottle and smelled of it and said: "I'm going to call the police." I had a telephone in the kitchen and one in the bedroom, so she took the phone up and said: "I'm going to call the police up and tell them you have gasoline around the children." Mr. Bennie snatched it out of her hand and started pouring it around and around the floor. He had a cigarette in his mouth and just struck a match and threw it down and it blew up. My bed caught fire, my children was in the bed, I was trying to get the children out. I got them out and that time him and her was still in the kitchen. The fire blazed up and I got my children out of the bed because the bed caught fire.

(Trial Tr. 167–8)

Moreover, the Court notes that it was the petitioner who brought the Clorox bottle full of gasoline into the house, as Dorothy Lee Blizzard testified that the bottle was not hers.

The second eyewitness to testify was Wilhelmina Blizzard.[4] She testified as follows:

Q: What did you say?
A: He had his hand over his jacket like that [indicating] and then—he had his hand over his coat and then he came in the back room and then he put down the Clorox bottle on the floor and Mae picked it up and smelled it and she say she going to call the police and tell them you got gasoline around these children and then he snatched it from her.
Q: Bennie snatched it from her?
A: Yes.
Q: You said it was a Clorox bottle?
A: Uh, huh.
Q: When did you first see the Clorox bottle?
A: When he put it on the floor.

Q: Did you see where it came from?
A: Out of his coat.
Q: Out of his coat. Now when Bennie snatched the bottle from her what happened next?
A: And then he had a cigarette in his mouth. He got the match and the flame went up fast.
Q: Fast. Now you said he lit a match?
A: Yes.
Q: Did he keep the match in his hand?
A: He throwed it.
Q: He throwed the match?
 And then it went up in flames?
A: Yes.
Q: Now, Wilhelmina, what happened then?
A: And then my Aunt Mae, she pushed me out of the fire so I wouldn't get burned.
Q: Did you see anything in the kitchen when you were pushed out of the fire?
A: Yes.
Q: What did you see?
A: Mr. Bennie and Mae tussling. They were tussling.

. . . . .

Q: What do you mean by tussling?
A: They were going side by side, moving side by side.
Q: You mean side by side, one beside the other, or do you mean back and forth?
A: Back and forth.
Q: Back and forth. Did you see them any more?
A: And then Mr. Bennie got Mae caught in the fire—my aunt. (Trial Tr. 222–3).

On January 20, 1971, after a trial by jury before Judge Green, the petitioner was found guilty of felony murder, second degree murder, and arson. The petitioner was sentenced by Judge Green on January 21, 1971, to a term of life imprisonment for the felony murder conviction. From judgment entered upon his convictions, Barnes perfected a timely appeal on June 22, 1971 based on four grounds. These grounds

---

**4.** The Court accepted Wilhelmina Blizzard as a competent witness, despite arguments to the contrary by petitioner's counsel, Mr. Dwyer. (Trial Tr. 103–04).

were (1) whether testimony as to a "confession" were obtained by interrogation of the petitioner prior to the so-called "*Miranda*" warning was erroneously received in evidence by the District Court, (2) whether it was error in permitting Officer Robert Tropf, Jr. to testify when the officer admitted he had lost his original notes, (3) whether the incriminatory statements of Mrs. Barnes qualify as a dying declaration exception to the hearsay rule, and (4) whether the trial court committed error by instructing the jury to consider the voluntariness of the petitioner's statements. The Court of Appeals affirmed the petitioner's conviction on all four grounds. *Barnes I.*

The petitioner filed a *pro se* motion to vacate sentence pursuant to 28 U.S.C. § 2255.[5] This motion was denied by Judge Green on April 6, 1973. The petitioner then sought to appeal *in forma pauperis* on July 11, 1973, which was denied by Judge Green on the same date. The Court of Appeals affirmed the denial of leave to proceed on appeal *in forma pauperis* on December 20, 1973.

On November 3, 1976, the petitioner, through counsel (the Public Defender Service), filed another motion to proceed *in forma pauperis* and a motion to vacate the sentence. The petitioner alleged, *inter alia*, that the statements in question were obtained involuntarily. This motion was also denied by Judge Green on November 3, 1976, from which the petitioner perfected a timely appeal.

The Court of Appeals, in a split decision, reversed and remanded, holding, *inter alia*:

> On remand, therefore, the district court may pursue either of two procedures. The court may first determine whether Barnes' statements were voluntary and hence admissible at trial. If so, appellant is entitled to no relief. Alternatively, the court may first determine whether the failure to raise the voluntariness issue either at trial or on appeal should preclude consideration of that claim in this § 2255 petition. If so, the court may deny relief without inquiring into the merits of appellant's contentions.

*Barnes II* at 894–5, (footnote omitted).

On September 21, 1979, Judge Green again found that the petitioner was entitled to no relief. The petitioner again filed a 2255 motion to vacate the sentence on October 1, 1979, which was denied on December 14, 1979. The petitioner again perfected a timely appeal.

The Court of Appeals reversed and remanded on December 1, 1980, for a *de novo* hearing on the voluntariness issue. *United States v. Barnes*, No. 80–1055 (D.C.Cir. Dec. 1, 1980); ("*Barnes III*"). Subsequently, Judge Green recused herself and the case was reassigned to this Court. This Court held a two-day hearing on April 23 and 24, 1981. Moreover, the Court stated that it intended to resolve and issue a ruling on both the question of whether the petitioner's statements were voluntary and the question of whether the involuntariness issue had been waived by trial and appellate counsel.

## FINDINGS OF FACT ON VOLUNTARINESS

The first statement petitioner attacks is the statement made to Sergeant Layfield, the first officer on the scene. On direct examination at the initial trial, Sergeant Layfield testified as follows upon responding to a radio broadcast:

Q: As a result of hearing the radio broadcast, what, if anything, did you do?

A: As a result of hearing the broadcast, I responded to 8th and L Street, North-

---

5. 28 U.S.C. § 2255 provides:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

west, at which time I parked my cruiser to respond to a trouble call at 1014 figure 8 Street, Northwest.

Q: 1014—8th Street, Northwest?

A: Yes, sir.

Q: Did you proceed to that address, sir?

A: Yes, sir, I did.

Q: Tell us in your own words what happened.

A: As I was walking toward that address, I was approached by two subjects, a female subject who was later identified as Dorothy Blizzard and a male subject who was later identified as Bennie Barnes.

Q: You say you were approached by the two?

A: Yes, sir, I was.

Q: Were they walking or running or what? . . .

Q: Now, what, if anything happened when you saw Mrs. Blizzard and this man?

A: Mrs. Blizzard made a comment, That is the one that set the fire. At this time I asked Mr. Barnes, I said—. . .

A: At this time Mrs. Blizzard stated that is the one that set the fire. *At this time I looked at Bennie and I said, "Is that true?" He said, "Well, I will take the blame for it." I said, "I am asking you if you set the fire." He said, "Yes, I did, but it was an accident."*

Q: Did he say anything further?

A: No, sir.

Q: What did you do then?

A: I placed him under arrest.

Q: Go on, tell us what happened then, if anything.

A: I placed him under arrest and walked on down to the front of 1014 figure 8 Street, Northwest, at which time I turned him over to Officer Tropf.

(Trial Tr. at 297–299) (emphasis supplied).

The second statement that the petitioner contests is that made to Officer Robert Tropf, Jr. That statement occurred during the following:

Q: You saw Sergeant Layfield with the defendant?

A: Yes, sir.

Q: What if anything did you do then?

A: Sergeant Layfield turned the defendant over to me and he told me to take him back to the car and call for a wagon and I clasped the defendant by the wrist and by the back and rear top of his trousers and at that time the lady, the deceased lady, Ella Barnes looked up at—

Q: *Had you seen Ella Barnes before that moment?*

A: *She was in plain view, sir, noticeable very easily. She was in front of and to the north of the entrance to 1014—8th Street, Northwest.*

Q: *When you saw her, was she standing up?*

A: *No, sir, she was lying down more or less on one side.*

Q: *Had you seen her before you took Mr. Barnes by the arm?*

A: *Yes, sir.*

Q: *Had you heard her say anything before you took Mr. Barnes by the arm?*

A: *Prior to my holding on to Mr. Barnes, all she was doing was laying there moaning, sir.*

Q: Was that?

A: Moaning.

Q: Moaning?

A: Yes, sir.

Q: *Now, you said that you took Mr. Barnes by the arm. What happened then?*

A: *Before I could turn and walk away with him to the scout car, Ella Barnes looked up at Bennie Barnes and stated you had no call to do that to me, Bennie, and lapsed back into moaning.*

Q: *What, if anything happened then?*

A: *I turned with the defendant and started back to the scout car, sir. And while on route back to the scout car, the defendant stated to me, I'm sorry I did it, what do you think they'll do to me?*

Q: *Mr. Barnes said that to you?*

A: *Yes, sir.*

Q: *Did you ask him anything?*

A: *No, sir.*

Q: *Did Mr. Barnes say anything further to you?*

A: *No, sir.*

Q: Did you eventually get back to the scout car?

A: Yes, sir, I did.

Q: What, if anything did you do then?

A: I advised Officer Fuksa to call for a wagon, which he did, and the wagon arrived almost immediately. The defendant, Bennie Barnes, was placed inside the wagon and was advised of his rights by—

Q: Did you have any further conversation with Mr. Barnes whatsoever?

A: No, sir.

(Trial Tr. at 356–358) (emphasis supplied).

The third statement that the petitioner seeks to suppress was made to Officer Steven A. Fuksa at No. 2 Precinct. It occurred during the following colloquy:

Q: *After you read him his rights, what, if anything did you do?*

A: *At that time I started filling out the proper forms.*

Q: As soon as you stopped reading his rights to him?

A: *Well, before that I asked him again if he understood what his rights were.*

Q: Did he respond?

A: Yes, he did.

Q: *What did he say?*

A: *He said he did.*

Q: All right. Then after he said that, what, if anything, did you do?

A: Then I started filling the forms out. I began asking him his name and his address.

Q: Go on, sir, what happened?

A: I asked him his name and his address.

Q: Did he tell you that information?

A: Yes, he did. *And while I was asking him his name and address, when I finished asking him his address, he stated that Ella had called him to the house at 1014 figure 8 Street, Northwest, and he responded there, and when he was there, they became involved in an altercation, at which time there was a plastic Clorox bottle.*

Q: He said she had?

A: *Yes, sir. Filled with gasoline. And she was going to throw it on him. And*

*he stated that he acted like any man, and he tried to kiss her. And at that time the bottle fell and ignited.*

Q: Did he say anything further?

A: No he didn't.

(Trial Tr. at 312–313).

The petitioner contests the voluntariness of the three statements in question based on his physical condition at the time the statements were made. The petitioner contends that the following was his physical condition at the time of the statements. The petitioner claims that his pre-existing condition included organic brain damage, mental retardation and lack of education, prior lack of experience with the law and a passive personality; i. e., fear of the police. The petitioner further claims that he was intoxicated, suffered from burns and smoke inhalation and other stressful factors, which included an encounter with his severely injured wife, accusations by Ms. Blizzard and Mrs. Barnes, encounters with the police and the fire and its aftermath.

The petitioner presented the testimony of Dr. Roland Wynne, a clinical and research psychologist. He was accepted as an expert in the field of psychology. (2255 Tr. 107). In preparation for his testimony, Dr. Wynne reviewed certain documents from petitioner's counsel, including some medical records, selected portions of the trial transcript, and the appellate opinion in *Barnes II*. (2255 Tr. 107–108). Dr. Wynne tested the petitioner on February 12, 1981, almost 12 years after the offense. (2255 Tr. 112). Based upon this testing, an interview, and a review of the aforementioned documents, Dr. Wynne formed the following opinion as to the petitioner's "general psychological condition" in March, 1969: "the petitioner was of borderline intelligence . . . [and] he suffers now and suffered then from progressive organic brain damage, which was a sequela . . . of chronic alcoholism." (2255 Tr. 109–110). He was said to be susceptible to stress, to react to stresses in a "helter-skelter" fashion, to be likely to "fall apart" under stress, and possibly to commit violent acts. (2255 Tr. 110–111). Dr. Wynne continued to attempt to characterize the peti-

tioner's condition some 12 years earlier. He opined that his reading level was very poor. (2255 Tr. 113–114). Yet, many of the doctor's comments concerned the petitioner's condition in 1981. (2255 Tr. 114–115). The doctor then undertook to provide his opinion as to the petitioner's psychological state on the morning of the crime, March 9, 1969; the petitioner "was in general in extremely poor intellectual and emotional shape." (2255 Tr. 116).

*Dr. Wynne acknowledged that he was "not 100 percent sure" that it was possible for him to draw valid conclusions about the petitioner's condition more than 10 years after the fact.* (2255 Tr. 123). Dr. Wynne's test results may not have been the same results that would have been obtained 10 years ago. (2255 Tr. 123–124). Indeed, prolonged institutionalization itself often has an adverse effect on people. (2255 Tr. 125–126).

In the St. Elizabeth's Hospital records of 1970, Mr. Barnes is described as having "mild mental retardation," with an IQ of 67. Dr. Wynne retested Mr. Barnes on February 12, 1981, and found his IQ to be 74. (2255 Tr. 111). Dr. Wynne testified that there was no statistical difference between an IQ of 67 and an IQ of 74, and that Mr. Barnes' intelligence fell between that of "dull normal and mentally retarded." (2255 Tr. 111–113). Further, the Court notes that Mr. Barnes never got beyond the fifth grade. (2255 Tr. 22). The petitioner further points to his lack of experience with the law and his passive personality.

The petitioner also raises the defense of his intoxication at the time of the statements to the three policemen. The petitioner testified at length that he and his friends consumed a quantity of alcohol on that fateful March 9, 1969. According to

the petitioner's testimony, eight half-pints of bourbon were purchased between noon and midnight of March 9, 1969. During the course of that day, this bourbon was consumed by Mr. Barnes, Mrs. Dorothy Blizzard, Mr. Harley Davis and Ms. Ella Mae Barnes. In addition, Mr. Barnes stated that he consumed two cans of beer by himself.[6] (Trial Tr. 424, 426, 443–448, 453, 458). Indeed, based on an elaborate hypothetical, Dr. Wynne, twelve years later, concluded that the petitioner was legally intoxicated and that such intoxication affected his capacity to make a voluntary statement to the police. However, the fact of the matter is that no one really knows how much the petitioner really had to drink.[7]

In presenting the elaborate hypothetical of Dr. Wynne, based on figures supplied by petitioner, the petitioner bypasses one important element. That is the description of the petitioner as provided by the police. Approximately two hours prior to the incident in question, Officer Samuel D. Morrison had a conversation with petitioner concerning the petitioner's desire to have his wife return home. (Trial Tr. 495). Although Officer Morrison did not consider the petitioner to be drunk, he did conclude that the petitioner had been drinking. "We could smell an odor of alcohol on his breath," Officer Morrison testified. (Trial Tr. 496). This was between midnight and 12:30 a. m. on March 9, 1969. (Trial Tr. 494, 497). Sergeant Layfield also testified at the § 2255 hearing that while it was quite possible that Mr. Barnes had been drinking previously, he did not consider the petitioner to be drunk. While the Court notes that the two officers are unable to determine that the petitioner was drunk to a degree of reasonable medical certainty, the *Court does find* that their experience and observations over a period of years in their work

**6.** The Court questions the credibility of the petitioner who testified at the § 2255 hearing that he consumed one quart of bourbon and 8–12 cans of beer within a relatively short period of time. (2255 Tr. 39–40) The Court questions if even one with an admittedly high tolerance level for alcohol could even move, much less remember with relative precision, all of the events of that fateful day if his claims

regarding alcoholic consumption were even remotely correct.

**7.** The amount of liquor alleged to have been consumed by the petitioner at the trial is in conflict with the amount alleged at the 2255 hearing. (Trial Tr. 424, 426, 443–48, 453, 458 and 2255 Tr. 39–41).

would enable them to give an opinion as to whether one is drunk and this would be entitled to substantial weight and certainly more than Dr. Wynne because they saw and heard what the defendant said and did afterwards, which the doctor did not.[8] After all, liquor on one's breath does not automatically or even remotely establish intoxication as a matter of law.

The petitioner also introduced the testimony of Dr. Marion Jordan, who was accepted by the Court as an expert in the care, treatment and management of burned individuals. (2255 Tr. 183). Dr. Jordan opined that the defendant had an 8 percent total body surface burn of the second degree which he claimed would have been extremely painful. (2255 Tr. 190). Alcohol in large quantities, however, would have diminished the pain. (2255 Tr. 190–191). He concluded the burns were second degree burns because the infirmary records indicated that the wounds healed without grafting. (2255 Tr. 195). Dr. Jordan also alluded to the *possibility* that the petitioner had some carbon monoxide poisoning and may have ingested toxic chemicals, *based upon certain inferences* the doctor made about the conditions during the fire. (2255 Tr. 195–197). A hypothetical person with 8 percent second degree burns and carbon monoxide poisoning and toxic chemical ingestion would commonly be totally hysterical. (2255 Tr. 197–198).[9] Some people would lose their memory and not recall what they had said at the time but this is not necessarily true for everyone under those circumstances. (2255 Tr. 199–200).[10] Not surprisingly, the state of mind of one who has witnessed a loved one on fire is one of high anxiety, mixed with guilt if he has been involved in the fire. (2255 Tr. 205). Finally, given a list of hypothetical conditions, including 8 percent second degree burns, substantial intoxication, criminal accusations, arrest, questioning, and smoke inhalation, the doctor concluded that he "would question the rationality of thought in those combinations of significant factors." (2255 Tr. 206–207). However, it was rational to say it was an accident in the face of the facts and the eyewitnesses.

On cross-examination, Dr. Jordan acknowledged that he does not know the defendant and has no direct knowledge of the facts and circumstances of this case. His only knowledge comes from what defense counsel gave him: the D.C. Jail records, a *selected* portion of the trial transcript, one of the appellate opinions, and Dr. Wynne's report which was prepared twelve years after the fact. (2255 Tr. 208). Dr. Jordan had never seen D.C. Jail infirmary records before and had no way of ascertaining their accuracy or the training and competency of the personnel who created those records. (2255 Tr. 208–209). The 8 percent figure he testified about did not appear in the records but, rather, was his "best-guess." (2255 Tr. 210). Moreover, Dr. Jordan characterized the burns as second degree, even though the records themselves note third-degree burns in several places, thereby disputing the *accuracy* and *reliability* of the records upon which he based his testimony. (2255 Tr. 210–212). Of course, Dr. Jordan did not know how Mr. Barnes' burns affected him specifically; nor could he accurately know how much alcohol Barnes had consumed or what his tolerance was. (2255 Tr. 212). Dr. Jordan was not aware of all the facts in this case, including stresses or lack thereof that may have been involved. (2255 Tr. 212–213). He noted an indication in the records that Darvon, an analgesic, had been prescribed for the defendant on an "as-needed"

---

**8.** As Officer Morrison testified:

Q: When you saw him [Barnes], sir, did he have any difficulty in talking to you?
A: No, sir. He wasn't drunk.
Q: Did he have any difficulty in answering your questions?
A: No, sir.
Q: Did he have any difficulty in walking or moving around?
A: No, sir.

(Trial Tr. 496).

**9.** There is no mention in the record that Barnes was in fact or in any way hysterical at the time of the incident.

**10.** However, as this Court has previously noted, the petitioner still remembered the events as they occurred more than eleven years ago.

basis, but there is no indication in the records that the drug was, in fact, needed or given to the petitioner. (2255 Tr. 200–201, 213–214).

Concerning Dr. Jordan's hypothesis about carbon monoxide, he explained that it is one of the three components of smoke inhalation. (2255 Tr. 215). The amount of toxic material ingested, however, depends upon the content of the materials on fire, something that Dr. Jordan did not know. Thus, he had no idea how much toxic material was actually in the area. (2255 Tr. 215–216). Moreover, it would have made a difference if windows or doors had been open in the area, and Dr. Jordan did not have this information, either. (2255 Tr. 216). *Accordingly, his testimony was "basically an opinion derived from a standard situation of a room and a fire going on inside the room . . . without regard to the actual facts in [this] case."* (2255 Tr. 216). (Emphasis supplied). It must also be pointed out that Dr. Jordan made no mention as to how long the petitioner was exposed to the smoke.[11]

## CONCLUSIONS OF LAW

Based upon the foregoing and the Court's assessment of the demeanor and credibility of the witnesses, the entire record herein, and the applicable law, the Court finds as a fact and as a matter of law that all of the petitioner's statements to the police were voluntary under the totality of the circumstances, and, hence, admissible at trial.

 It is a fundamental principle of constitutional law that a confession must be voluntary before it can be admitted in a criminal proceeding to establish guilt of the accused. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) and *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In the case

at bar, the Court finds that the three statements in question were the product of a rational intellect and a free will. *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). The Court in *Blackburn* held the statements inadmissible, for there, the defendant was insane and incompetent at the time of the statements. Such a showing has not been made in this case. Indeed, Saint Elizabeth's Hospital found that Mr. Barnes was competent for trial and that there was no causal connection between said defect and the alleged offense.[12] (July 20, 1970 Saint Elizabeth's letter). The Court finds that the petitioner freely, voluntarily, knowingly and intelligently gave his version of the tragic event to the police immediately after it happened and stuck to his story consistently. Even at the § 2255 hearing before this Court, some twelve years later, the petitioner's testimony was consistent with his statements to the police, thereby adhering to his original defense, i. e., it was an accident.

While none of the conditions of the petitioner cause a per se determination of involuntariness, the Court, in examining the totality of the circumstances, along with the petitioner's physical condition, as well as the applicable case law, finds the petitioner's statements to be voluntary. The petitioner submits that the appropriate test for determining voluntariness is found in *Pea v. United States,* 397 F.2d 627, 634 (D.C.Cir. 1967):

> The makeup of a free man includes his mechanisms for self-preservation, to refrain from speech that may endanger him. If he does speak out his statement is admissible on the reflection of his free will, if his self-preservation mechanism and its impetus to silence is overridden by pressures within his own personality, by

---

11. Further, Wilhelmina Blizzard testified that the petitioner went into the bathroom after the fire started because smoke was not going into the bathroom. (Trial Tr. 224). While the Court notes that there is no way of determining the amount of smoke entering into the bathroom, it does show that Dr. Jordan *had no way at all* of determining the amount of smoke inhalation suffered by the petitioner.

12. Where the issue of petitioner's mental condition was not raised at trial or if raised, was determined by the trial court, the judgment and sentence is not thereafter subject to collateral attack. A report from a qualified psychiatrist can substitute for a judicial determination. *Hereden v. United States,* 286 F.2d 526, 527 (10th Cir. 1961).

his own conscience, religious feelings, sense of duty, etc. But his statement does not reflect his own free will or intellect if his statement is attributable in critical measure to the fact that his self-protective mechanism is negated or over-ridden by external force or fraud, condition of insanity, the compulsion of drugs.

This is clearly not the situation in the case at bar. There was no external force or fraud exerted on the petitioner.[13] As indicated above, the petitioner was not insane, either during the commission of the crime or at trial, nor was the petitioner under the influence of drugs. In *Pea*, the Court found that defendant's statements were inadmissible as involuntary since the "defendant's condition of a concussion, with a bullet lodged in his head, left him coherent but lethargic, not normal and indifferent to protecting himself. *Id.* at 634. Indeed, *every* case cited by the petitioner is clearly distinguishable from the case at bar. For example, in *Wan v. United States*, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (1933), the petitioner was held incommunicado for a week, during which time he became very weak, before the alleged statements were made. The Supreme Court held that a confession obtained by compulsion must be excluded. *Id.* at 14, 45 S.Ct. at 14. There has been no such showing of coercion in the case at bar.

Petitioner's reliance upon *Beecher v. Alabama*, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1964) is equally misplaced. There, the petitioner's statements were held inadmissible, as he was forced to make a confession. The petitioner, already wounded in the leg, was forced to confess to a rape and murder while the local Police Chief and another officer held their guns to his head while presenting the petitioner with the ultimatum of either confessing or being killed. *Id.* at 36, 88 S.Ct. at 189. Statements made by the petitioner in *Brown v. Mississippi*,

297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1937) were also suppressed, as the confessions were shown to have been extorted by Officers of the State by torture of the accused. Again, the petitioner, Barnes, has not shown any such coercion at all and as previously established, he was shown to be guilty anyway by independent evidence, to wit, the eyewitness testimony that he committed the crime.

The petitioner asserts that his physical illness aggravated by a lack of medical attention should negate the possibility of the statements being voluntary. The petitioner relies upon *Greenwald v. Wisconsin*, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) in which statements were suppressed where the petitioner, who was on medication for high blood pressure, was taken to the police station where he was interrogated from 10:45 p. m. until midnight without being advised of his constitutional rights. The interrogation continued at 8:45 the next morning. The petitioner was not offered food and continued to be without medication for his high blood pressure. Nothing remotely similar happened in this case. In the case at bar, the petitioner, Barnes, was not kept for a long period of time, nor was he on medication. Rather, the petitioner made the statements almost immediately after the incident and they were simultaneously corroborated by statements by the eyewitnesses who stated that the petitioner did indeed start the fire. The Court notes that those eyewitnesses had no interest in hurting the petitioner. Further, the petitioner received appropriate medical attention for his burns within a short period of time.[14] Indeed, there is no allegation, nor could there be here that such medical attention was unreasonably withheld in order to secure a confession.

The petitioner further claims that his intoxication would negate the voluntariness

---

**13.** The only alleged force was Officer Tropf grabbing the petitioner by the wrist and by the back and rear top of his trousers after the first two statements were made. (Trial Tr. 356).

**14.** The petitioner was taken to the hospital for treatment around 8:00 or 9:00 the next morn-

ing, which was less than nine hours after the fire. Further, the first two statements occurred at the scene of the fire and the third was made at the precinct after the petitioner had been read his rights.

of his statements. In *Gladden v. Unsworth*, 261 F.Supp. 897 (D.Oreg.1966), *aff'd*, 396 F.2d 373 (9th Cir. 1968), statements by the defendant were suppressed due to intoxication. This was because:

> The undisputed evidence shows that Unsworth at the time of his arrest was too intoxicated to make a voluntary statement and that the statements he made were "the product of a mind benumbed or confused by alcohol, made at a time when the defendant himself had no understanding or realization of what was going on or what he was saying" and therefore were inadmissible.

*Id.* at 902. However, in the case at bar, the eyewitness testimony of the officers on the scene was that petitioner Barnes was not intoxicated. Indeed, the petitioner still remembers with amazing clarity the events of the day in question. The defendant was not confused or benumbed, rather he realized what was going on and what he was saying.

While the lack of mental capacity or formal education may in some instances render a confession suspect, that alone is not enough. In *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1153, 20 L.Ed.2d 77 (1968), the defendant, who had a ninth grade education, was kept overnight and denied food and his medication and the Court held the statements involuntary and inadmissible. In *Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967), the defendant, who had a third grade education with a limited mental capacity, had his confession produced by violence and threats of violence. Once again, the Court held the statements inadmissible as they were involuntary. The defendant in *Culombe v. Connecticut*, 367 U.S. 568, 609, 81 S.Ct. 1860, 1882, 6 L.Ed.2d 1037 (1961), was illiterate, with a mental defect, was denied a lawyer and was kept in jail for five days until he confessed. A mentally dull youth was also held incommunicado for three days without counsel, advisor or friend, and with very little food in *Payne v. Arkansas*, 356 U.S. 560, 563–64, 78 S.Ct. 844, 847–48, 2 L.Ed.2d 975 (1957). Both of these cases also held the statements inadmissible as the statements were clearly involuntary. However, despite petitioner Barnes' alleged low intelligence, the Court does not find any legally or factually sufficient coercion that was prevalent directly or indirectly in this case. Indeed, in the first and third statements, the petitioner stated that it was an accident and the third was completely spontaneous.

The fact that the petitioner saw his wife immediately after the fire is likewise not enough to taint the voluntariness of his statements. This situation is distinguishable from *Boles v. Stevenson*, 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964), for in *Boles*, the police took the defendant inside the store to view the badly mutilated body of the victim. In the case at bar, Sergeant Layfield merely took the petitioner to the scene of the fire without knowing anything that happened, to turn Barnes over to the other officers. Further, Mrs. Barnes was still alive at the time the petitioner saw her. The Court finds that the police did not attempt to trick the petitioner in any way, nor is such even alleged here. *See United States ex rel. Delle Rose v. LaVallee*, 342 F.Supp. 567, 575 (S.D.N.Y.1972).

Accordingly, based on the totality of the circumstances, the Court finds that the three statements of the petitioner in question were completely voluntary, and, thus, properly admissible at trial.

Indeed, this case is the very thing that Judge MacKinnon recently opposed in his very vigorous dissent in *United States v. Kearney*, No. 81–1043, slip op. at 2 (D.C.Cir. July 20, 1981) in which he stated:

> This case personifies the great abuse of repetitive post conviction § 2255 proceedings that clog the courts and raise unjustified hopes in petitioner that a new trial years down the road from their conviction will leave the government with insufficient witnesses and evidence to obtain a conviction for a most heinous offense.

*See United States v. White*, No. 80–1214 (D.C.Cir. July 23, 1981). The petitioner's defense from the very beginning here was that the crime was an accident. This was

the theory advanced by competent trial counsel and with which this Court agrees with. The jury disbelieved it, and accordingly found him guilty as they were bound to have done under their oath by virtue of the evidence. *See supra* pp. 948–950.

## THE WAIVER ISSUE

While the Court finds that the three statements in question are voluntary, the Court, nevertheless, will also address the issue of whether the petitioner waived his right to raise the voluntariness issue. (2255 Tr. 17). Based upon the following, the Court finds that the petitioner has in fact waived any right to raise the voluntariness issue.

After considering the foregoing, it is ludicrous after eleven years, three appeals, and four 2255 motions to second guess the trial strategy and tactics of one who practiced in this Court for 19 years or appellate counsel who has practiced law since 1944 after having served as a law clerk to an appellate judge of the Second Circuit. (2255 Tr. 302). Based upon years of experience, this Court feels strongly that even a mentally deprived and educationally disadvantaged person generally tells the truth. This obviously is true in this case, for since the day of the murder and through all the legal processes and hearings, the defendant has held to one story, namely that he burned his wife to death as a result of an accident. In addition to the foregoing, if this Court were to reach out at this stage for a legal technicality to set aside the conviction in the face of the undisputed evidence against the defendant as to his guilt would be sheer folly and is the very thing that brings disrespect to the legal profession and the judiciary. The record will not and does not support such a result anyway both as to the facts and the law.

The next question which this Court addresses is whether the petitioner has "deliberately by-passed" the orderly procedures provided by trial and appellate courts. *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *United States v. Johnson*, 562 F.2d 649 (D.C.Cir.1976). The petitioner submits that the Court should inquire whether the petitioner intentionally relinquished a known right or privilege. The Court of Appeals, in the 1979 remand suggested a number of questions which the District Court might consider, depending upon the legal standard it employed. *Barnes II*, 610 F.2d at 894.

The evidentiary hearing on the waiver issue will naturally focus on why counsel failed to object to the introduction of Barnes' statements on voluntariness grounds. Although the precise inquiry will depend on what standard the court deems applicable, the relevant questions might include: (1) whether the omission was or is susceptible of being interpreted as an intentional trial tactic, (2) whether it was an advertent (conscious and knowing) decision by counsel, (3) whether it was negligent or unreasonable, (4) whether it amounted to ineffective assistance, and (5) whether appellant was apprised of counsel's intention to acquiesce in the admission of his statements at trial.

The original trial counsel for the petitioner, Mr. John Dwyer, stated at the 2255 hearing that his trial strategy was to have the statements introduced into evidence by the government. As Mr. Dwyer pointed out at the hearing, there were certain inescapable facts with which he was presented:

Q: What was your basic understanding of the basis of the Government's case after your discovery?

A: At the time I entered—I do not know whether you are asking me for the thought processes at the time. At the time I entered the case I was confronted with this situation: the woman had burned to death. There was no question about that. She died of the burns. Bennie Barnes was on the scene. There was not any question about that. I could not prove he was not. My objective as a defense lawyer was to acquit Bennie Barnes of the first degree charge or as many charges as possible.

I am faced with those inescapable facts. I am faced with several witnesses in the house. Gasoline was in the house. The

woman burned up with the gasosline. The gasoline was ignited. Presumably the woman did not light it and set herself on fire. Presumably the other witnesses didn't. So I am confronted with that set of facts.

Now, what do I do with those facts? Bennie Barnes is there. His woman is the one that burned up. She is dead. The only legitimate reason or defense that I could come up with was the one that Bennie first of all told the police. The gasoline was there. It was set off by an accident. This is why I thought I elaborated in my cross-examination at trial about the possibilities of this gasoline catching fire by the pilot light on the stove, . . . .

(2255 Tr. 249–50)

Based on these facts, the Court finds that it was an eminently reasonable tactical decision that enhanced the presentation of the *only* plausible defense available to the defendant. Further, experienced trial counsel wanted the statements in. As Mr. Dwyer stated:

> The defense in this case as I saw it, and I never heard anybody in the last five years of litigation suggest a different defense in this case, I do not know of any other defense that we could have interposed except that which Bennie Barnes himself spontaneously told the policeman, "Yes, I was there," inescapable. The woman is dead. The woman is burned up because of the fire. It was an accident.

(2255 Tr. 251).

Indeed, petitioner's new counsel has not suggested a different tactical approach, rather they seek to have a new trial after more than twelve years. The Court finds that to grant a new trial in the face of the overwhelming evidence of guilt would be a travesty now on the basis of all the facts.

The second issue *Barnes II* indicated that this Court should address is whether the failure to raise the voluntariness issue was an advertent decision by counsel. As indicated above, the Court finds that it was an

advertent decision. This opinion was also shared by appellate counsel. As Mr. King stated:

> I felt that Mr. Dwyer had made a strategy decision as a trial counsel. I understood it and I accepted.

(2255 Tr. 309).

Notwithstanding the fact that the voluntariness issue might have been raised does not mean that it should have been. Since the failure to raise it was obviously deliberate, this operates as a waiver of the petitioner's opportunity to argue the same on a collateral attack particularly in the face of all the other evidence of guilt.

The third issue to be considered by the Court is whether it was negligent or unreasonable to fail to raise the voluntariness issue. Again, the Court finds that it was not negligent or unreasonable and that able trial counsel indicated that he wanted the statements in and that there was no cause to try to keep them out on voluntariness grounds. (2255 Tr. 274–5). Additionally, to have claimed that petitioner's statements were involuntary because he was "drunk" and "confused" is patently inconsistent with petitioner's testimony which required a great memory and ability to recall the circumstances surrounding the murder, which he has now done on several occasions.

The fourth issue is whether both Mr. Dwyer and Mr. King provided ineffective assistance of counsel. The answer here is obviously no!! The vicious attack on Mr. Dwyer for the alleged mistakes he made are absolutely incredible and unworthy of belief or credence. Indeed, petitioner's counsel chastises Mr. Dwyer at the bench for the inconsistencies and lack of memory on the details of the events which occurred more than twelve years ago,[15] where his file is no longer available due to a fire. (Petitioner's Proposed Findings at 56). The Court notes that such a loss of memory could happen to the other witnesses as well. Further, the Court notes that this whole proceeding boils down not to the introduction of the three

---

**15.** The court does find that there are not many individuals who can remember with specificity events that occurred more than twelve years ago.

statements per se, but the fact that the government introduced the statements. As petitioner's counsel stated at the bench:

The Court: . . . considering the circumstances of this and what the defendant said, that it might be very well to try to build, as Mr. Dwyer at one point in his case did, around the circumstances that this was an accident

Mr. Bellows: It doesn't make sense that he would litigate a *Miranda* claim on all three statements, and then not raise the voluntariness issue when it would have been easy to win on the Miranda issue.

The Court: Supposing, as he said, he won on those motions—

Mr. Bellows: —If he had won on those motions—

The Court: —then he wouldn't have been able to use them.

Mr. Bellows: That's not true at all. He would have been free to introduce all three of those statements during this case.

The Court: If they were suppressed at his request, he could still use them?

Mr. Bellows: Yes, he would be free to bring them out. It would be his decision to bring them out. It would be his trial strategy to use them.

(2255 Tr. 320–21).

Based on the above dialogue, it is clear that, as Mr. Bellows points out, it was a legitimate tactical trial decision as to the use of the statements. By virtue of the fact that the statement(s) could not be attacked on Miranda or voluntariness grounds, the decision of Mr. Dwyer was appropriate and the Court so finds.

The final issue is whether the petitioner was apprised of counsel's intention to acquiesce in the admission of his statements at trial. There is a disagreement between the petitioner and Mr. Dwyer. Mr. Dwyer indicated that he discussed the trial strategy with the petitioner. (2255 Tr. 251). The petitioner, who has spent the last decade in jail, states that Mr. Dwyer did not discuss trial strategy. The Court adopts the testimony of Mr. Dwyer. In light of the petitioner's limited intelligence, education, and lack of legal training, it was entirely proper, indeed necessary, for Mr. Dwyer to make the ultimate strategy decisions and Courts under similar circumstances have long held that to be within the rights and duty of trial counsel. To hold otherwise would make it impossible for any lawyer to defend one of limited intelligence except at substantial risk to his reputation years later. *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977).

Therefore, it is the Court's conclusion, as a matter of law, that the defendant, by competent counsel at trial and on appeal, has "deliberately by-passed" the appropriate procedures for challenging the voluntariness of his statements. Since the petitioner failed to raise the voluntariness issue at trial or on direct appeal, it would only disrupt the orderly administration of justice, encourage perjury and bring about prejudice to the government and the community. Certainly, it is easy to see under the circumstances of this case that there is no constitutional argument based on any amendment in the Bill of Rights to allow a petitioner so guilty as this one to be given a new trial. The petitioner has had his chances with the help of at least two experienced trial and appellate lawyers. The dormant issues of the voluntariness and admissibility of his statements at trial are pure "nitpicking" in the context of the facts herein and are obviously not raised in order to provide petitioner with some semblance of an honest defense. This "deliberate by-pass" operates as a waiver and precludes consideration of the issue now on collateral attack, and accordingly, relief must be denied.

In any event, under the circumstances of this case, even an erroneous admission of the statements would have been harmless error because of the overwhelming independent evidence against the petitioner. As previously stated, there were three eyewitnesses to all the events; they all knew the petitioner; the petitioner was present at the scene; he had argued with the decedent that day; the decedent had made a detailed dying declaration consistent with the testi-

mony of the eyewitnesses, implicating the petitioner in this gruesome and vicious crime; and the physical evidence corroborated all of this. The petitioner, moreover, testified at trial consistent with the statements he made to the police—that the fire was an accident. He has never, nor has his present counsel, to this day, suggested any different theory of defense. *Wainwright v. Sykes*, 433 U.S. 72, 91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977) makes it clear that the erroneous admission of defendant's statements can be harmless error if the defendant was not prejudiced thereby, as follows:

> The other evidence of guilt presented at trial, moreover was substantial to a degree that would negate any possibility of actual prejudice resulting to [the defendant] from the admission of his inculpatory statement.

### CONCLUSION

In summary, the Court concludes, based upon the foregoing findings of fact and conclusions of law, that petitioner's § 2255 motion must be denied. There are two independent bases for this denial: (1) the petitioner's statements to the police were voluntary under the totality of the circumstances and, hence, admissible at trial; and (2) the petitioner's failure to raise this issue at trial or on direct appeal was a waiver and precludes him from raising it now or ever on collateral attack in the context of this case. Moreover, there was no ineffective assistance of counsel either. In this case, justice and the Constitution have been served by a learned, sensitive, careful, and competent trial judge (Judge June L. Green) and two conscientious lawyers, at trial and on appeal. Few petitioners have had such careful and conscientious scrutiny of their claim as the one in the case at bar. This is what makes our system the best in the world, but the time has long since come to stop as previously indicated herein. Otherwise, the public, the bench, and the bar, will become a laughing stock. Accordingly, all relief is denied and the petitioner's § 2255 proceeding be, and the same hereby is, dismissed with prejudice.